Argued June 23, affirmed July 25, 1922.

# STATE v. BRUMFIELD.

(209 Pac. 120.)

**Indictment and Information—That Deputy Prosecuting Attorney, Acting Before Grand Jury, was a Resident of Other County not Ground for Quashing Indictment.**

1. Refusal to quash indictment on the ground that an attorney who was a resident of another county was permitted to be in the grand jury room, and to examine witnesses, in violation of Section 1424, Or. L., prohibiting the presence of persons other than the district attorney and witness actually under examination, *held* proper where such attorney had been regularly appointed and sworn as a deputy prosecuting attorney for the county, since he was a *de facto* officer, even if a resident of other county.

**Indictment and Information—Grand Jury Drawn from Panel Summoned for Special Term During Recess of Grand Jury for Existing Term Could Return Indictment Against Defendant Held to Appear While Grand Jury for Existing Term was in Session.**

2. Where a new grand jury was drawn from panel summoned for a special term during recess, subject to call by order of the court of the grand jury for the existing term which had been in session when the defendant was held to answer without his case being submitted to or acted upon by such grand jury, the grand jury summoned for such special term could return an indictment against the defendant.

Criminal Law—Change of Venue Because of Prejudice Discretionary
    With Court.

3.   An application for change of venue on the ground of prejudice
existing against the defendant in the county in which the case was
set for trial is addressed to the sound discretion of the court.

Criminal Law—Refusal to Change Place of Trial Because of Preju-
    dice Held not Abuse of Discretion.

4.   Where newspaper accounts of a murder were spread all over
the state, and the crime was given wide publicity in every part
thereof, and where affidavits filed in support of defendant's motion
for a change of venue on ground of prejudice against him in the
county in which the case was set' for trial were contradictory as to
whether the defendant could be accorded an impartial trial, the re-
fusal to change the place of trial to another county *held* not abuse
of discretion.

Jury—Challenge of Juror for Bias Addressed to Discretion of Court.

5.   Under Section 123, Or. L., challenge of a juror on account of
actual bias is addressed to the discretion of the court.

Criminal Law—Ruling on Challenge of Juror for Actual Bias not
    Disturbed in Absence of Abuse of Discretion.

6.   Court's ruling on challenge of juror for actual bias will not
be disturbed in the absence of abuse of discretion.

Jury—Court in Passing on Challenge for Cause for Bias not Bound
    by Juror's Answers.

7.   The court in passing on a challenge of a juror for actual bias
is not bound by the answers of the juror.

Jury—Refusal to Discharge Juror on Challenge for Actual Bias not
    Abuse of Discretion.

8.   Where a murder had been given wide publicity, and news-
paper accounts thereof had been widely circulated, the refusal to
excuse juror who admitted having read about and discussed the
case, and who admitted having formed an opinion, but stated that
he would decide the case solely upon the testimony, and not be in-
fluenced by what he had read and heard, *held* not abuse of discre-
tion.

Criminal Law—Error in Admission of Testimony must be Affirma-
    tively Shown.

9.   Error in the admission of testimony is not presumed, but
must be shown affirmatively, and if, on any reasonable theory of
the case as disclosed in the testimony actually, heard, the evidence
might have been admissible, its admission will not be held errone-
ous.

Homicide—Evidence That Defendant Took Out Insurance Policies
    Held Admissible to Prove Motive.

10.   In prosecution for murder, in which it was the theory of the
state that the defendant had killed deceased with a view of caus-

4.   Weight of newspaper articles as evidence of prejudice against
accused entitling him to a change of venue, see note in 18 Ann.
Cas. 789.

ing the body of the deceased to be mistaken for that of the defendant, testimony that shortly before the homicide the defendant had procured life insurance in a large amount in favor of his wife *held* admissible to show motive.

**Criminal Law—Refusal of Instructions Covered by Those Given not Error.**

11. The refusal of requested instructions covered by the instructions given *held* not error.

**Homicide—Instruction Submitting Defense of Insanity Held Sufficient.**

12. In a homicide prosecution, instruction submitting the defense of insanity *held* sufficient.

**Homicide—Death Penalty may be Inflicted for First Degree Murder.**

13. The death penalty may be inflicted for first degree murder.

From Douglas: GEORGE G. BINGHAM, Judge.

In Banc.

The defendant on August 31, 1921, was indicted by the grand jury of Douglas County for the crime of murder in the first degree, alleged to have been committed on July 13, 1921, by then and there, by means to the grand jury unknown, killing one William Dennis Russell unlawfully, feloniously, purposely and of deliberate and premeditated malice. A trial was had and the defendant was convicted of murder in the first degree and sentenced to death, from which judgment he appeals to this court.          AFFIRMED.

For appellant there was a brief over the name of *Messrs. Rice & Orcutt,* with an oral argument by *Mr. Dexter Rice.*

For respondent there was a brief over the names of *Mr. George Neuner, Jr.,* District Attorney, and *Mr. Joseph L. Hammersley,* with an oral argument by *Mr. Neuner.*

McBRIDE, J.—The bill of exceptions is very meager, none of the testimony produced at the trial

being brought up, except as to the admission of certain applications for life insurance; and but for the statements of counsel in their respective briefs, this court stands as entirely uninformed as to the facts of this case as the average citizen who reads the newspapers. Barring the objection to the admission of the applications for insurance before alluded to, there is no contention here as to the admission or rejection of evidence. The principal ground relied upon by defendant on this appeal is the action of the court in refusing defendant's application for change of venue and its action in overruling challenges made by defendant to certain jurors. There are also objections made to the action of the court in overruling defendant's motion to quash the indictment, all of which will be discussed in this opinion. We will consider the objections urged by defendant's counsel in their chronological order.

The assignments of error relied upon by defendant's counsel are: First, the refusal of the court to quash the indictment; second, the refusal of the court to grant a change of venue; third, the action of the court in overruling defendant's challenges to certain jurors; fourth, the admission by the court of applications made by defendant for life insurance in favor of his wife; fifth, the giving of certain instructions to the jury and the refusal by the court of certain requests for instructions; and sixth, the unconstitutionality of the statute prescribing the death penalty for murder in the first degree.

1. The first objection is to the refusal of the court to quash the indictment, and the basis of this exception is the fact that Joseph L. Hammersley, a resident of Portland, was permitted to be in the grand jury room and examine witnesses during the prog-

ress of the investigation before that body. This objection is based upon Section 1424, Or. L., which provides:

"No person other than the district attorney or a witness actually under examination can be allowed to be present during the sittings of the grand jury."

However, it appears from the undisputed record that Joseph L. Hammersley was regularly appointed and sworn as a deputy prosecuting attorney for Douglas County and as such attended sessions of the grand jury while this case was being investigated. It is claimed and is probably true that he was then a resident of Multnomah County, but he was at least a *de facto* officer, and the court very properly refused to try out the title to the office collaterally. For all the purposes of this case he must be treated as a regularly appointed deputy prosecuting attorney.

2. It also appears from the affidavit that on August 16, 1921, the court made an order calling a special term of court for August 29, 1921, and directing a panel to be drawn for such special term. It is charged that the grand jury for the then existing term had not been discharged but was "recessed" subject to call by order of the court, and that on August 29th a new grand jury was drawn from the panel summoned for the special term. The sole objection to these proceedings is that the case should have been submitted to the grand jury of the previous term instead of the new grand jury. The court as a court submits nothing to any grand jury. Cases in which the parties are held to appear automatically go before a grand jury, if that body is then in session, or if such is not the case, to the next grand jury in session. Granting for the sake of argument that the previous grand jury was actually in session

when the defendant was held to answer and that his case was not submitted or acted upon, but passed over, it does not follow that such neglect would operate as an acquittal or discharge from liability to an investigation by a subsequent grand jury. The convening of the special term on August 29th had the effect to discharge the panel of the previous term, including the grand jury, and there is no contention as to the regularity of the drawing and impaneling of that grand jury.

The argument of counsel for defense when reduced to its concrete terms is this: (1) There was a grand jury at recess and subject to call by the court when defendant was held to answer. (2) The court should have called it and the case should have been submitted to it. (3) By reason of the failure so to do, the next grand jury was powerless to find an indictment. And the logical conclusion would be that if the next grand jury could not indict, then no subsequent grand jury could indict, and the defendant, even though as guilty as the trial jury found him, would go unwhipped of justice. This analysis, which we assume to be fair, presents a proposition so shocking to every conception of justice that it amounts to a *reductio ad absurdum.*

In this state the courts have always refused to allow mere technical objections to the method of impaneling a grand jury to enable a defendant to escape the consequences of a trial upon the merits: *State* v. *Witt,* 33 Or. 594 (55 Pac. 1053); *State* v. *Bock,* 49 Or. 25 (88 Pac. 318).

The next objection made is to the action of the court overruling defendant's motion for a change of venue on account of such prejudice against the defendant in Douglas County as would preclude him

from having a fair trial in that community. Attached to the motion are several newspaper articles from the "Roseburg News Review," the "Portland Journal" and other papers having a large circulation in Douglas County, purporting to give an account of the alleged murder and commenting in the severest terms on the conduct of the defendant and asserting his guilt in unstinted, not to say intemperate, language. It is evident that whatever feeling against the defendant these articles tended to create was not confined to Douglas County, but the accounts were spread all over the state and on account of the singular and unique character of the crime and the consequent wide publicity which the circumstances of its commission had attained, there was probably not a man in the state capable of being a juror who had not become acquainted in some degree with these newspaper articles and formed some tentative opinion from the perusal of them. So general had been the publicity thus given that it does not seem probable that a removal of the case from defendant's home county where he had resided for many years and, in the language of his severest critics, "had occupied the pinnacle of the highest culture," would have given him any advantage or secured him a more impartial jury than that obtained in his own county.

3, 4. Beyond the newspaper articles which speak for themselves, the affidavits filed by the respective parties are contradictory of each other, reputable citizens who ought to have had opportunities to know the prevailing sentiment of the community being of the opinion that it was not such as to preclude the defendant from being given a fair and impartial trial. The motion for change of venue was made before Judge HAMILTON, who resided at Rose-

burg, and by him denied. The matter was reopened when Judge BINGHAM was called to preside, and again was denied. Here we have the deliberate judgment of two able and experienced jurists that a change of venue would not promote justice and was unnecessary, and since this was a matter intrusted to the sound discretion of the court we are not prepared to say that such discretion was abused: *State v. Humphreys,* 43 Or. 44 (70 Pac. 824); *State v. Armstrong,* 43 Or. 207 (73 Pac. 1022); *State v. Smith,* 47 Or. 485 (83 Pac. 865); *Multnomah County v. Willamette Towing Co.,* 49 Or. 204 (89 Pac. 389).

The next objection urged is to the action of the court overruling defendant's challenge to certain jurors on the ground of actual bias. It is impracticable to give in detail the examination of all the jurors to which this objection applies, but at the risk of prolixity, and as fairly exemplifying the objections generally, to give in full the examination of one juror, Mr. Vincent Applegate, presenting as it seems to do, every phase of the examination of the other jurors who were unsuccessfully challenged by defendant:

"Q. Where do you reside, Mr. Applegate? A. Yoncalla.

"Q. You live in the town of Yoncalla? A. No, I live about a mile from town.

"Q. You have resided there for a good many years? A. All my life.

"Q. Are you a man of family? A. No, sir.

"Q. Are you acquainted with the defendant, Dr. Brumfield? A. I have met him.

"Q. Were you acquainted with Dennis Russell? A. I have met him.

"Q. Do you know any of the members of his family, brothers, Ed Russell or Tom Russell? A. No, sir.

104 Or.—33

"Q. Have you read anything about this case, Mr. Applegate? A. Yes, I have read practically all of it.

"Q. In what newspapers, please? A. Oh, in the Roseburg paper and the 'Oregonian,' mostly.

"Q. You have read the daily 'Roseburg News Review'? A. No, I have not read the daily, but I have read some of the articles, but not all of them.

"Q. You are a subscriber to the weekly? A. Yes, sir, the semi-weekly, I think.

"Q. You are a subscriber to the daily 'Oregonian'? A. Yes, sir.

"Q. Now, have you read any of the articles in the 'Portland Journal' in regard to this case? A. I probably have read some of them, but I am not a subscriber to that. I mean I have picked the paper up and read an article or two, but I don't remember what articles they were.

"Q. Or the 'Portland News'? A. No, sir, I have never read that.

"Q. 'Telegram'? A. Yes.

"Q. Have you attempted, Mr. Applegate, to follow the newspaper reports of this case quite closely? A. Yes, sir.

"Q. You have become interested in it, and followed it quite closely? A. Yes, sir.

"Q. Do you recall reading an article in the 'Roseburg News Review,' purporting to give the testimony of the witnesses before the coroner's jury? A. Yes, sir.

"Q. Did that article give the names of the witnesses and the substance of what he was said to have testified to? A. I don't remember the name.

"Q. I say, did it give the names of the witnesses that were called? A. Yes, sir, it gave the names.

"Q. And the substance of what each witness was supposed to have testified to? A. Yes, sir.

"Q. Did you also read in the 'Roseburg News Review' an article which purported to give the testimony before the grand jury? A. Yes.

"Q. Now, that article also gave the names of the different witnesses that appeared before the grand jury, did it not? A. Yes, sir.

"Q. And also a statement of what each witness was presumed to have testified to? A. Yes, sir.

"Q. You read those articles, did you, that appeared in the 'Roseburg News Review,' which purported to give a statement of the defendant's financial condition? A. Yes, sir.

"Q. Also the article about some mysterious woman? A. Yes, sir.

"Q. And the motive assigned by this newspaper for the commission of the alleged crime? A. Yes, sir.

"Q. Did you also read an article in the 'Roseburg News Review' in regard to some Looking Glass hermit? A. I think I did.

"Q. Did you read an article that was published in the 'Portland Journal' in regard to the treatment the defendant received from the officers having him in charge here? A. I read an article in some paper, I do not remember what paper it was, in regard to that.

"Q. Do you recall reading an article, in any of the Portland—or in the 'Portland Journal' which pretended to give a complete history of this transaction written in rather a story form? A. I did not read all of that article.

"Q. A story woven around a muddy creek? A. I read part of that article, but I don't think I read all of it.

"Q. Now, have you discussed this case with anyone, Mr. Applegate? A. Yes, sir.

"Q. Quite extensively? A. Rather, yes.

"Q. And where has this discussion taken place? A. Around Yoncalla.

"Q. Both around the neighborhood in which you live and in the town of Yoncalla? A. Yes, sir.

"Q. Have you visited Roseburg since the 13th of July? A. No, sir, only through here, I did not stop in Roseburg.

"Q. Have you discussed the case with Commissioner Long? A. I don't think I have.

"Q. Have you ever heard him discuss the case? A. I cannot say that I have. I don't remember if I did. Probably have heard him say something about it, but I don't remember particularly that I have.

"Q. Do you know whether any of the people with whom you talked were witnesses either before the grand jury or the coroner's jury? A. I don't think they were.

"Q. Now, what was the nature of these discussions? A. Well, I just—well, just the case was discussed.

"Q. The people with whom you talked were telling what they understood the facts to be? A. Yes, sir.

"Q. And you were telling them the facts as you understood them? A. Yes, sir.

"Q. Now, from your reading and discussing this case, have you formed an opinion one way or the other in regard to it? A. Yes, sir, I have.

"Q. Is that a firm and fixed opinion? A. Pretty firm.

"Q. Is it such an opinion as would require evidence to remove? A. Yes, sir.

"Q. And would it require strong evidence? A. Well, rather strong, yes.

"Q. Do you feel in your mind that you have sufficient information about the case upon which to form an opinion? A. Well, I don't know as to that, a person would form an opinion from reading the articles I have read and from the discussions I have had.

"Q. And from the discussions you have had? A. Yes, sir.

"Q. You have expressed that opinion, have you, that you have formed? A. Well, I cannot say that I have expressed it publicly.

"Q. Well, you have expressed it to other people with whom you have talked? A. Certainly.

"Q. Your opinion of the case? A. Yes, sir.

"Q. And did they also express their opinion? A. Yes, sir.

"Q. Do you feel that the opinion you have would influence you in any way if you are accepted as a trial juror in this case? A. Just how did you place that question?

"Q. I say, do you feel that the opinion that you now hold would influence you if you are accepted as a trial juror in this case? A. I don't think that it would, if the evidence I hear will justify my changing it.

"Q. But you would require evidence from the other side against whom you have formed the opinion to remove the opinion you now have? A. Yes, sir.

"Q. And you would not require, then, I assume, any further evidence from the side supporting your opinion? A. No, I don't believe I would.

"Q. You think, then, do you, that if you heard no other evidence in the case you would be sufficiently satisfied to return a verdict? A. Yes, sir.

"Q. Now, have you ever sat as a trial juror in a criminal case? A. I never have.

"Q. Well, the law is, that in the trial of a criminal case, the defendant is presumed to be innocent. A. Yes, sir.

"Q. And that he is entitled to have that presumption attend him throughout the trial? A. Yes, sir.

"Q. And it is incumbent upon the state to prove to your satisfaction beyond a reasonable doubt the truth of each and every one of the material allegations in the indictment against him before you are warranted under the law in returning a verdict of guilty against him. Now, do you agree with that principle? A. I do.

"Q. And do you feel that even if that was not the law, you would be willing to freely give a fellow citizen the benefit of that presumption and doubt? A. I think he should be entitled to it.

"Q. Well, now, is your mind in such condition, Mr. Applegate, that you could, if accepted as a juror, in the trial of this cause, give the defendant the benefit of that presumption the law gives him? A. I think I could.

"Q. Do you feel that the opinion you now have, you could lay aside upon the beginning of this trial and disregard it? A. It would be pretty hard to do, but I guess a person could do it.

"Q. Well, how do you feel about it, you know best what the opinion is, and how strong it is? A. I don't know that I could lay it aside entirely.

"Q. Do you feel that that opinion would influence you in the trial of the cause in weighing the testimony that is given here in court? A. Unless the testimony was strong enough that I could see where I was wrong.

"Q. In other words, you would look to the other side, or the side against whom you formed the opinion to show you that you are wrong now? A. Yes, sir.

"Q. And you place that burden upon that side? A. Yes, sir.

"Q. Then you do have a bias at this time, do you? A. I do at this time, yes, sir.

"Q. And do you feel that that would affect you, if taken as a juror? A. I am afraid that it would.

"Q. Suppose, Mr. Applegate, that you were unfortunate enough to be on trial for your life, and your desire was to obtain a jury that was absolutely fair and impartial and unbiased, would you be willing to take a man on your jury whom you knew to be in the same frame of mind in regard to your case as you know yourself to be in regard to this case? A. I don't believe that I would.

"Q. Have you any bias or prejudice against a defense of insanity? A. No, sir.

"Q. Do you feel that if that issue—do you feel that if you were accepted as a juror and that matter should become an issue in this case, that you could try it in this kind of a case as fairly and impartially as you could if the issue was presented to you in any other case? A. I think that I could.

"Q. Do you feel that you would not be prejudiced against a defense of that kind, then? A. I don't think that I would.

"Q. You read what the newspapers had to say, I believe, in regard to this defendant's mental condition? A. Yes, sir.

"Q. Now, have you discussed that or not with your neighbors? A. Yes, sir.

"Q. That has entered into the discussion of the entire case? A. Yes, sir.

"Q. And have you formed any opinion at this time in respect to that question? A. Well, I cannot say that I have formed a fixed opinion in respect to that.

"Q. The opinion you have in regard to that is not as strong as the opinion you have on the other issue of the case? A. No, sir.

if the Court please."

"Mr. Rice: We challenge the juror for actual bias,

"Mr. Neuner: We desire to resist the challenge."

"The Court: Do you want to ask any questions?"

"Mr. Neuner: I would like to ask a preliminary."

Examination of juror by Mr. Neuner:

"Q. Mr. Applegate, the opinion that you say you entertain at the present time is derived solely from the account you read in the newspapers, as I understand you? A. And the discussions I have had.

"Q. Discussions of what? Of the newspaper articles that you read? A. Yes, sir.

"Q. Have you talked with any person who purported to know what the facts were, or witnesses in the case? A. I have talked to no witnesses.

"Q. Have you talked to any person who purported to know what the truth is in this matter, or had knowledge beyond reading the newspapers? A. I don't know that I have.

"Q. Then, could you lay what opinion you have aside and try the case upon the evidence given upon the witness-stand, and the law given you by the court? A. As I said, I can lay my opinion aside if the evidence was sufficient to warrant it.

"Q. Well, now, what do you mean by that, Mr. Applegate? Do you mean you would require the state to prove to your satisfaction beyond a reason-

able doubt that what you read in the newspapers was true? A. Yes, sir.

"Q. Now, supposing that the evidence that you had read, or something purported to have read, was not introduced in evidence, would you still weigh that as evidence in the case? A. No, I don't think that I would.

"Q. You know then that your mind is such that you could enter into the trial of the case and try the issues here upon the evidence and the law, disregarding anything that you have read or discussion you have heard of these articles? A. I think that I could.

"Q. Do you know that you could? A. No, I don't know that I could.

"Q. Well now, that would be then, contradictory to the answer to your former question that you would not take into consideration anything that you have read, if accepted as a juror and decide this issue upon the evidence as given from the witness-stand and the law as given to you by the court? A. I did not understand you.

"Q. Did you understand the former question correctly, that if accepted as a juror you would try this case upon the evidence here by the witnesses who were sworn in court to testify and not by what you have read in the newspapers? A. Well, I would try to.

"Q. Well, you know your mind best, now, do you know whether you could do that? A. I think that I could.

"Q. And you could disregard anything that you have read, or opinion that you have formed by reading these articles, lay that aside, and try the case here upon sworn testimony? A. I think so.

"Mr. Neuner: We resist the challenge."

Examination of juror by the court:

"Q. Mr. Applegate, you understand, I presume, that the accused is entitled to be confronted by the witnesses against him? A. Yes, sir.

"Q. And he is entitled to have an opportunity to cross-examine those witnesses in regard to their tes-

timony, you understand that? A. This is my first experience in a criminal court.

"Q. I understand that, but there always has to be a first case, you know. Now, then, you understand also, don't you, that a man should not be held responsible for anything excepting which comes from the witnesses on the witness-stand, during his trial? A. Yes, sir.

"Q. Because otherwise he would have no opportunity to know, or to meet what some other person might say. Now, do you understand also that when accepted as a juror you were to decide this case solely upon what you may hear here in court, and if the testimony should be—if some things that you have heard—if they are not referred to in court, and not brought up against him, that should be disregarded? A. I understand that should be, yes.

"Q. And if accepted as a juror you will decide this case upon the testimony that occurs herein, and the instructions of the court, and put out of your mind anything else that you may have read or you may have heard to the contrary, you understand that, don't you? A. I understand that, yes, sir.

"Q. Now then, if accepted as a juror, would you do that? A. I would try to.

"Q. Well, then, in fairness to the defendant you ought to know whether you could do that or not, or whether you would do that if accepted as a juror. Not hypothetical objections, but whether or not you as a man say that you have such control over your mental faculties that you would be enabled to do that. A. I would try to do that way.

"Q. Well, do you believe that you could? A. I think that I could.

"The Court: The challenge will be overruled."

"Mr. Rice: We would like to save an exception, if the Court please."

"The Court: You may save an exception."

Examination of the juror by Mr. Neuner:

"Q. Have you any bias or prejudice against circumstantial evidence? A. Yes, to a certain extent, I have.

"Q. Is it such that you could—that you would disregard the law, or is your bias or prejudice such that you could follow the law, and give it such weight as his Honor might instruct you it is entitled to? A. I think I could follow his instructions.

"Q. Have you any conscientious scruples against capital punishment—that is the law which has for its —that carries with it the death penalty? A. No, sir.

"Q. Then, do you know of any reason why you could not be a fair and impartial juror in this case? A. Only that I have an opinion already made up, but as I said, I would try to overcome it.

"Q. Well, do you understand, Mr. Applegate, that a person accused of a crime is presumed innocent until that—until the charges against him are proved to your satisfaction as a trial juror, beyond a reasonable doubt? A. I understand that, that he is supposed to be innocent.

"Q. A defendant accused of a crime is not required to prove anything, but it is the duty of the state, the accusing party, to prove to the satisfaction of the trial juror beyond a reasonable doubt the material allegations of the indictment, do you understand that principle? A. I understand that, yes, sir.

"Q. Now, would you and could you adhere to that principle? A. I think I could.

"Q. Is your mind such that you could accept the court's instructions as to what constitutes a reasonable doubt? A. Yes, sir, I think my mind is—

"Q. As well as the instructions, the other instructions that are given, that might be given, defining the different terms of law in this case? A. Yes, sir.

"Q. You understand, as I said before, that a person accused of crime is tried upon the law and evidence in court? A. Yes, sir.

"Q. The testimony given by the witnesses and the law given by the court. Now then, if you were accepted as a juror, sworn to try this case, will you

try the issues involved here between the state and this defendant upon the sworn evidence of the witnesses given by the witnesses from this witness-stand and the law given to you by the court? Yes, sir.

"Q. Assuming for the purpose of this question, that the defense in this case is a plea of insanity, and the court should instruct you that that is a plea that when interposed must be established by the defendant to the satisfaction of the trial jurors beyond a reasonable doubt, would you require the defendant to establish his insanity to your satisfaction beyond a reasonable doubt? A. Yes, sir.

"Q. If there is a reasonable doubt in your mind, after you have heard all the evidence introduced by the defendant in that regard, would you construe that doubt in favor of the state, if his Honor should instruct you that that is the law? A. I would try to follows his Honor's instructions.

"Q. You know of no reason, then, why you could not do that? A. No, sir.

"Q. You say that you are not acquainted with any of the parties here? A. No, sir.

"Q. And what papers did you say you subscribe to, the 'Roseburg News Review' and the [Portland] 'Oregonian'? A. Yes, sir.

"Q. Now, these articles that counsel mentioned that you read were articles besides those appearing in the 'News Review' and the 'Oregonian'? A. I read some articles in some of the other Portland papers, but I don't remember what papers they were in.

"Q. And do you know of anything now that would prevent you from going into the trial of this case fairly and impartially, and if accepted as a juror do justice between the State of Oregon and this defendant? A. I don't think that I do, only what I have already stated.

"Mr. Neuner: We pass the juror."

Examination of the juror by the court:

"Q. Mr. Applegate, I want to be quite sure now in this matter. Some of these answers seem to be not

very consistent. It is not whether you have an opinion now or not, but whether if accepted as a juror you will lay that opinion aside and disregard it, and decide this wholly upon the testimony and instructions you hear here in court? A. Well—

"Q. No. You know whether you can do that or not, and as a matter of conscience, it is up to you, and if you cannot do that, you are not qualified. A. Well, if the evidence produced is strong enough to change my opinion, I certainly will try to—

"Q. Well, don't you know that the defense does not have to prove anything? It is the state that has the whole burden of proof. A. Yes, sir. I understand.

"Q. And you are to decide this case not upon what you have read or heard, but what you may hear here in court. A. Yes, sir, I understand that.

"Q. And if accepted as a juror would you decide the case solely upon what you hear in court here, and not let anything that you have read or heard to interfere with your deciding it upon the evidence here in court? A. Yes, sir.

"Q. You understand that and can you do that? A. I think that I can.

"Q. Well, you must know whether you can or not. 'I think' sometimes means yes and sometimes means doubt. Now, you know what control you have over your mind, over your reasoning powers, and you know whether you have the mental power to do that or not. A. Yes, I think I can do that.

"The Court: We still think he is qualified."

The disqualifications of a juror challenged on account of actual bias are no longer judged in this state by the rules of common law, but are to be determined by Section 123, Or. L., which is as follows:

"A challenge for actual bias may be taken for the cause mentioned in the second subdivision of Section 121; but on the trial of such challenge, although it should appear that the juror challenged had formed or expressed an opinion upon the merits of the cause

from what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially."

This section has been construed and commented upon by this court in many cases, notably in *State* v. *Armstrong,* 43 Or. 207 (73 Pac. 1022), and *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306, 14 Ann. Cas. 130). In *State* v. *Armstrong* the facts regarding the actual bias of the jurors challenged were very similar to those disclosed in the examination of Applegate and the other jurors whose acceptance on the panel in this case is alleged as error. The remarks of Mr. Justice WOLVERTON so completely fit conditions in the case at bar that they are worthy of repetition:

"There is a similarity in the examination of all these jurors on their *voir dire,* and we will only indicate the general character of their testimony, without noticing it in detail. They were all from points outside of Baker City, the place of trial, and away from the scene of the homicide. They had read accounts of the tragedy in the newspapers of their county and others from abroad, had discussed the affair more or less with their families and neighbors, and had formed and expressed opinions based upon such accounts and from what they had heard other persons relate touching it; but none of them had talked with any witness in the case, that he was aware of, or any person assuming to give the facts from his own knowledge, and all information acquired was entirely from hearsay. Some of these jurors, on their examination in chief, indicated that they would go into the jury-box with the opinions they had formed, and that it would take evidence, sworn testimony, to remove the same; one of them saying that he hardly thought he would start in the case with his mind entirely free and unbiased; an-

other that it would require a good deal of evidence to remove the opinion he had; and another that it would require 'pretty solid testimony' to remove it. One of them signified that his opinion was fixed until removed, but all of them, either by further elucidation in the examination in chief or by cross-examination in answer to questions propounded by the court, expressed a conscientious belief that they could go into the jury-box without any bias or prejudice against the defendant, disregard their respective opinions theretofore formed or expressed, and hear and decide the case alone upon the testimony and the law given them at the trial. Most, if not all, of them asserted that the opinion formed was not such as they would be willing to act upon at the present time.

"By our statute, upon the trial of a challenge for actual bias, the opinion of the juror, formed or expressed upon the merits of the cause, derived from what he has read or heard, is not in itself sufficient to justify the allowance of such a challenge. The statute referred to has been construed by this court so many times that it has now become well understood [Section 123, Or. L.]. If the trial court is satisfied, from an appropriate examination of the juror, that he can conscientiously disregard such an opinion, and hear and determine the case impartially upon the facts and the law as given at the trial, the challenge may be properly denied. Safeguarded by a careful scrutiny of the trial courts to determine that the juror is without bias or prejudice as a trier of the cause, the statute is not inimical to the constitutional right of the accused to a trial by an impartial jury. It recognizes the idea, patent to everyone, that men of intelligence will think upon matters of general information, though obtained through the ordinary avenues by which common intelligence is dispensed, and will very naturally arrive at some conclusion or opinion relative thereto, and, being of social instincts, will discuss such matters in their intercourse with their fellow men, and express the opin-

ions thus formulated. It also very properly accredits intelligence with the powers of discrimination and right reasoning, uninfluenced by preconceived notions and vague opinions formed upon insufficient knowledge; and that men of honest impulses, controlled by an innate sense of justice, will be able to lay aside and disregard impressions and opinions of this character, and to determine causes upon sworn testimony alone, governed by the rules of law applicable thereto as given by the court. It is but reasonable to believe that upright and conscientious jurors can and will thus deport themselves when called upon to administer justice. Were it otherwise, the jury system would cease in a great measure to be the palladium of civil rights, and in many cases, in the present time of rapid and wide dissemination of the accounts of important and extraordinary events, it would be almost impossible even to secure twelve men of a community or county eligible as jurors in the trial of a cause. There would be at least an elimination of those who read and inform themselves, and a relegating of the administration of justice to a class of citizens not the more intelligent, contrary to the spirit of the jury system, and the constitution and laws of the state. Where, therefore, the information acquired upon which the opinion is formed and expressed is hearsay in character, and does not emanate from a source purporting to speak to a personal knowledge of the facts, it does not alone disqualify the juror. The determination, consequently, of a juror's competency is necessarily and primarily a question for the trial court, which should ever keep in mind the ultimate object to be attained, namely, a trial by a fair and impartial jury; it being, as above indicated, a matter largely for the exercise of a sound discretion, and the findings of the trial court upon a challenge for actual bias are not the subject for review unless there has been an abuse of such discretion, or it has been arbitrarily exercised to the injury of the litigant: *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441); *Kumli* v. *Southern Pacific Co.,* 21 Or.

505 (28 Pac. 637); *State* v. *Ingram,* 23 Or. 434 (31 Pac. 1049); *State* v. *Brown,* 28 Or. 147 (41 Pac. 1042); *State* v. *Kelly,* 28 Or. 225 (42 Pac. 217, 52 Am. St. 777); *State* v. *Olberman,* 33 Or. 556 (55 Pac. 866); *State* v. *Savage,* 36 Or. 191 (60 Pac. 610, 81 Pac. 1128); *State* v. *McDaniel,* 39 Or. 161 (65 Pac. 520).

"Measured by this enunciation of the law and those authorities, it is quite clear that the jurors challenged in the present case were, under the findings of the trial court, not disqualified to sit in the cause. None of them had a fixed and settled opinion, nor had they such an opinion as to the guilt or innocence of the accused that they could not disregard upon the trial, and a verdict render according to the sworn testimony there adduced and the law as given them by the court. The expression of one of the jurors that it would require a good deal of evidence to overcome the opinion he had formed, and of another that it would have to be 'pretty solid testimony,' must be read in the light of the examination then being prosecuted by the defendant's attorney, which was calculated to lead them to such an assertion; but, when their attention was called to the principle that their verdict must be based alone upon the testimony adduced at the trial, they signified a conscientious and honest belief that they could disregard such opinion, and the trial court was impressed that they could, and, finding no bias or prejudice against the defendant, disallowed the challenge. We can find no reason under the law for disturbing the findings, and hence there was no error in denying any of the challenges interposed."

5, 6. In the case at bar the trial judge had the advantage, which we have not, of having the challenged parties before him, and observing their demeanor, apparent intelligence and candor, all of which are factors in the trial of a challenge for cause. And under these circumstances his judgment as to their ultimate qualifications is entitled to great weight and

the discretion confided to him should be respected unless it is shown to have been abused.

7, 8. The affidavits filed with the motion for a change of venue show that this was in some respects a unique case and one which had been generally discussed in the newspapers all over Oregon, perhaps to the extent that most of the people of the state must have read of it and formed some sort of opinion regarding its merits. The time has gone by in Oregon when the fact that a citizen reads and thinks disqualifies him from jury duty. It was to secure intelligence instead of ignorance in the jury-box that Section 123, Or. L., was enacted, and now the question is not so much whether the prospective juror has read or heard at second hand the purported facts in the case and upon these has formed an opinion, but rather whether in the opinion of the trial court he is capable of disregarding such an opinion and trying the case fairly and impartially upon the evidence adduced in court. Take a case such as the Guiteau, or the Czolgosz murder, and try to secure a jury whose members should go into the jury-box with their "minds as a blank sheet of paper" in relation to the fact, and the result would be a panel composed of men whose minds would be equally blank in all respects. In the present case the trial judge took the final part in the examination of jurors, carefully explaining to them the legal rights of a defendant and examining them strictly to ascertain whether or not their minds were in such a condition that they could accord to the defendant such rights, and while he is not bound in his discretion by the answers returned, such answers are valuable data from which to determine subsequently the qualifications of the juror. We do

104 Or.—34

not feel that the discretion confided in the court was abused in any instance in the present case.

9, 10. The next exception relied upon is the admission by the court of evidence that defendant had prior to the alleged murder procured life insurance in a large amount in favor of his wife. Here again we are embarrassed by the meagerness of the record as contained in the bill of exceptions. Error in the admission of testimony is not presumed; it must be shown affirmatively, and if on any reasonable theory of the case as disclosed in the testimony actually heard, the evidence might have been admissible, the objection to its introduction is untenable. The bill of exceptions does not profess to give all the testimony connected with the alleged homicide or defendant's connection therewith. Preceding the testimony objected to is this brief statement:

"Two witnesses for the state, namely: Dany Campbell and Lloyd Davis, testified in substance: That about 11 o'clock on the night of July 13, 1921, they discovered defendant's car upturned by the roadside in a ditch and on fire; this point being about three miles west of Roseburg and between Roseburg and the defendant's home. That they immediately drove into Roseburg, secured assistance and returned to the burning car, and discovered a body lying beside the car. That they then immediately returned to Roseburg and notified the coroner, M. E. Ritter, and Deputy Sheriff Percy Webb.

"M. E. Ritter, coroner for Douglas County, as a witness for the state, testified in substance: That upon visiting the scene of the burning car in company with Deputy Sheriff Percy Webb, he found the defendant's car wrecked and burning, as described by the witnesses Campbell and Davis. That beside the car he found the decapitated body of a man. There was no clothing upon the body, except a burned shoe

and part of a stocking on the right foot.  A ring was upon the finger of the corpse, and the body was badly burned.

"The witness Percy Webb corroborated the testimony of the witness Ritter, and these two witnesses testified in regard to finding certain personal property in the immediate vicinity of the body, including pipe, watch, fountain pen and pocket diary, which personal property was identified by other witnesses as the property of Dennis Russell.  Certain other personal effects were found in the immediate vicinity of the car, and were identified by other witnesses as the personal effects of the defendant.  The ring was removed from the body by Coroner Ritter, and was identified by state's witness Glen W. Eddings as the ring of the defendant, and was identified by state's witness G. C. Finlay as being defendant's ring."

This shred of testimony is everything that the bill of exceptions contains regarding the evidence adduced on the trial.  The briefs of counsel taken together give a detailed account of purported testimony, but they are unauthentic and of no more value than the newspaper accounts published before and during the trial.

The state for the purpose of proving a motive for the killing of Dennis Russell called upon the stand C. S. McElhinny, who testified that he was the agent for Douglas County, of the Oregon Life Insurance Company, and identified three applications for life insurance in said company made and signed by the defendant, one for $6,000 made May 2, 1921, one for $4,000 made September 21, 1914, and one for $6,000 made February 27, 1911, all payable to defendant's wife, and further testified that all these policies were in force on July 13, 1921.  To this defendant's counsel objected, on the ground of incompetency, irrelevancy and immateriality.  In this particular case the

testimony was competent because the policies themselves were presumably in the possession of the defendant and it would have been improper for the state to call upon him to furnish evidence against himself by producing them; and even if in the possession of his wife, she could not have been compelled to produce them. It was material upon the evident theory of the state that the defendant had killed the deceased and cut off his head, put his own ring upon a finger of the body and caused the corpse so mutilated to be placed under the car with a view of causing the body to be mistaken for his own. In the absence of a full statement of the evidence in regard to the connection of defendant with the killing or rather in the significant omission of the presiding judge to certify that the excerpt quoted is all the testimony in regard to defendant's connection with the crime, we are authorized to assume that there was other testimony on that subject. Instances of like murders and substitutions for the purpose of enabling the relatives of the guilty party to collect insurance upon his life, while happily rare are to be found in the books. The case of *State* v. *Novak,* 109 Iowa, 717 (79 N. W. 465), bears a striking resemblance to this case in its general circumstances. The defendant there as here carried heavy insurance upon his life, which insurance was payable to his wife. He decoyed a friend into his store, killed him, placed his body on a cot in his store where he was himself accustomed to sleep, placed a pair of scissors which he was accustomed to carry, and his own identification check, near the body, set fire to the store and disappeared, was finally arrested in Canada and subsequently tried and convicted. We mention

this instance not because it announces any principle of law applicable here but to show that the desire to profit by such murder and substitution of the murdered person's body for that of the murderer in order that the estate of the latter may benefit from his life insurance, has furnished a motive for a crime similar to that of which the defendant stands accused. Among motives for the commission of crime, *"auri sacra fames"* probably stands first and is the most frequent.

When some terrible crime has been committed such as detailed in the case above, or under circumstances related by the district attorney in his brief which may be used here by way of illustration, the mind naturally seeks for a motive. If the circumstances point, as, considering the verdict of the jury they must have pointed to the guilty agency of the defendant, one would naturally inquire, "What motive could possibly have induced a man of good reputation in the community to commit such an act?" adding, "It is incredible. I cannot believe it." "But," says the state, "if he could have induced the public and the insurance companies to believe that the dead body with his ring on its hand was his own body, his wife would have realized $16,000 by the fraud; here is a motive reasonably adequate." It is not necessary that the evidence as to motive shall be conclusive, but it is a circumstance with all the other facts in the case and to be given such weight as in the judgment of the jury it is entitled to.

Nor is it necessary as concerns the admissibility of the evidence that the alleged motive shall conclusively appear to the average honest man as overpowering and apparently adequate to have induced the defendant to commit the crime. Mr. Lawson in his work

on Presumptive Evidence cites the case of *Rex* v. *Bishop*, 2 Lond. Legal Obs. 39, where an Italian boy was murdered with the intent on the part of the murderer to sell his body to a medical college for fifty dollars, and he speaks of another case where the teeth of the victim were dug out of his jaws and sold to a dentist for three dollars. The same author also calls attention to the case of *People* v. *Hendrickson*, 1 Park Cr. Rep. (N. Y.) 406, where the defendant was indicted for the murder of his wife, wherein it was held that that was relevant which went to show that by the will of the victim's father the defendant would be entitled to a part of the estate of her father in case of her death; and also to another case where the defendant was indicted for setting fire to his own home and evidence that the building had been overinsured was held competent as showing a motive for the commission of the alleged crime.

In the case of *People* v. *Hendrickson, supra,* the court said:

"Considerable latitude is allowed on the question of motive. Just in proportion to the depravity of the mind would a motive be trifling or insignificant which might prompt to the commission of a great crime. We can never say that the motive was adequate to the offense, for human minds would differ in their ideas of adequacy, according to their own estimate of the enormity of crime, and a virtuous mind would find no motive sufficient to justify the felonious taking of human life."

In many of the cases cited by Mr. Lawson the evidence admitted was much less cogent and the alleged motive much more remote than in the case at bar; but its remoteness goes merely to its weight, not to its relevancy. The objection to this testimony does

not upon the record here presented appear to have been well taken.

11. The next objection is that the court erred in refusing to give the following instruction requested by the defendant:

"The defendant is charged with the crime of murder in the first degree. Murder in the first degree is defined as follows: 'If any person shall purposely, and of deliberated and premeditated malice kill another, such person shall be deemed guilty of murder in the first degree.' Before the defendant can be convicted of the crime charged, it is necessary for the state to prove to your satisfaction beyond a reasonable doubt, that the defendant killed William Dennis Russell. That the act was purposely done; that is, that it was intended, and that the purpose to so take life was the result of deliberate and premeditated malice; that is, that defendant had deliberately made up his mind in cool blood to kill Russell, and that he did kill him without justification, and there must be some other evidence of malice than the mere proof of the killing. Deliberation and premeditation shall be evidenced by poisoning, lying in wait, or some other proof that the design to kill was formed and matured in cool blood and not hastily upon the occasion.

"To deliberate is meant to weigh the motive for the act, its consequences, the nature of the crime and the things connected with the intention with a view to a decision thereon. In order to deliberate, one must be capable of the exercise of such mental powers as are called into use by the consideration and weighing of the motives, of the consequences of the act, and he must be in possession of a mind capable of conceiving a purpose to act."

The court in its general charge fully covered every material point suggested in the above request, and carefully and lucidly defined malice, deliberation and

premeditation and was not required to repeat that definition in the exact language requested by defendant's counsel. The same may be said of the next requested instruction.

Requests V and VI, which the court refused to give in the language therein suggested, are as follows:

"If you find from the evidence that defendant killed Russell and are not satisfied beyond a reasonable doubt that defendant was insane at the time to the degree necessary to excuse him entirely for his acts as I have defined legal insanity to you, yet in considering the degree of murder you are entitled to take into consideration the defendant's mental condition for the purpose of determining whether or not he was capable at the time of forming an intent to kill and deliberating in cool blood; that is, whether or not he was master of his own understanding, and if you should find that defendant was in such a mental state as not to be capable of deliberating in cool blood, or was not master of his own understanding, then, in no event could he be guilty of murder in the first degree, even though he may have been able to distinguish right from wrong.

"I instruct you that in considering the question as to whether or not defendant was insane at the time of the commission of the alleged crime, that you should consider the whole evidence in the case; his mental condition prior and subsequent to the crime; his acts and conduct at the time of, and within a reasonable time before and after the alleged criminal act; his conversations, exclamations, declarations and letters written by him; his past history, that of his family; his appearance and conduct while testifying and during the trial; and if you find a crime has been committed, the character of the crime; his previous reputation as being a quiet and peaceable citizen, the presence or absence of motive, and any and all matters upon which testimony has been introduced in this case; that is to say, in considering

this question of the insanity of the defendant you are not limited to the testimony of medical experts or close acquaintances, but you should consider all the testimony in the case in determining this issue.''

The court gave the following instruction in regard to the defense of insanity:

''The defense of insanity has been interposed in this case, and this defense of insanity is perfectly legal and a proper defense to interpose and it is your duty, under your oaths, to give to the evidence on this branch of the case, the same careful consideration that is required of you as to the other portions of the case.

''The law presumes every man to be sane, until he establishes in the mind of the jury, beyond a reasonable doubt, the fact of his insanity. In other words, the burden is upon the party claiming insanity as a defense, to make out that defense beyond a reasonable doubt; and if you have any reasonable doubt as to whether the defendant at the time of the commission of the alleged homicide, if he did commit it, was sane or insane, the state is entitled to the benefit of such doubt, and you should reject such defense.

''Insanity, to excuse crime, must be such a disease of the mind as dethrones reason and renders the person incapable of understanding the nature, quality and consequences of his act, or of distinguishing between right and wrong in relation to such act.

''It is not every eccentricity of mind, however well established, that will excuse the commission of an act otherwise criminal.

''If a party, notwithstanding some mental disease or infirmity, still has reason enough to know the act which he proposes to commit is wrong and unlawful, knows the nature and quality of the act, has the power of deliberation and premeditation, the power to do or refrain from doing, the act charged as a crime, such mental disease or infirmity will not avail as a defense. In other words, while the law will not punish a person for an act which is the result of or

produced by mental disease or infirmity, it will punish him for an unlawful act not the result of or produced by or influenced by mental disease, even though some mental unsoundness or infirmity is shown to have existed. In its legal sense, insanity is a defect or disease of the mind which renders a person incapable of entertaining a criminal intent.

"The law recognizes partial as well as general insanity. That is, that a person may be insane upon one or more subjects, and sane upon others; but the same rule applies to both kinds of insanity. Whether insanity be general or partial, the defendant must have been mentally diseased to such a degree that his reason was dethroned at the time of the commission of the act complained of. When reason ceases to have dominion over the mind, proved to be diseased, a person reaches a degree of insanity where criminal responsibility, for the purpose of punishment, would no longer exist. The question of insanity has exclusive reference to the acts with which the defendant is charged at the time of its commission, and it is his mental capacity at that time which the jury must determine. After all is said, the test of legal insanity is this: Did the defendant at the time of the killing, if you believe from the evidence beyond a reasonable doubt that he did kill William Dennis Russell, in the manner and form charged in the indictment, know what he was doing and that he was doing wrong? If he did know what he was doing and that it was wrong, he was legally sane and amenable to the law. If he did not know that what he was doing was wrong, he was legally insane, and is excused from the commission of the act, and in determining whether or not he was legally insane, you should accept the definition of legal insanity which the court has just given you.

"In this case, evidence has been introduced relating to the mental capacity and condition of the defendant, Richard M. Brumfield, at the time William Dennis Russell is alleged to have been killed, and if you are satisfied beyond a reasonable doubt that the

defendant killed him in the manner and form alleged
in the indictment, or within the lesser degrees in-
cluded therein, then you are to consider the mental
capacity of the defendant at the time the homicide
is alleged to have been committed.

"There is a legal presumption, gentlemen of the
jury, that a person intends the ordinary consequences
of his voluntary act. This is a disputable presump-
tion, and may be controverted or overcome by evi-
dence, and so far as the capacity to form a criminal
intent is concerned, it is sufficient to hold the defend-
ant responsible under this indictment, when he did
the act charged, if you so find he did the act charged,
and had sufficient reason and understanding to know
the nature, quality and consequences of the act he
was doing and to distinguish between right and
wrong in relation to that act as I have heretofore
defined it to you.

"There have been a number of witnesses called to
testify as medical experts, to give their opinion,
based upon hypothetical questions propounded to
them, and in that regard I instruct you that before
the opinions of such witnesses have any value what-
ever in determining the sanity or insanity of the de-
fendant, or his want of mental capacity, you must
first find that the hypothetical facts upon which such
opinions are based are true, and if you find them to
be true, then you must consider such opinions in con-
nection with all of the other testimony in the case
and give to such opinions such weight and credit as
you believe they are entitled to receive.

"The law of this state permits intimate acquain-
tances to give their opinion concerning the mental
sanity of the accused, but they must give their rea-
sons for such opinion. All of the evidence intro-
duced on the part of the defense bearing upon the
mental sanity of the defendant, giving defendant's
actions, conduct and appearance before, at the time,
and after the alleged homicide and the circumstances
of the alleged killing, in connection with all other
testimony, is with a view of determining his mental

sanity at the time of the alleged killing of William Dennis Russell.

"If, after an entire consideration of the evidence in this case, you are satisfied beyond a reasonable doubt that at the time of the commission of the act charged in the indictment, if it was so committed, as therein alleged, the defendant was laboring under a defect or disease of the mind which dethroned his reason, rendered him incapable of understanding or appreciating the extent, nature, quality and consequence of the act he was committing, or that by reason of mental disease he was unable to distinguish between right and wrong in relation to such act, he should be acquitted on the grounds of insanity, and if you should find him not guilty upon the ground of insanity, you must state that fact in your verdict."

12. This covers all phases of the question of insanity as a defense and of the evidence necessary to establish it. It leaves the whole matter to the jury upon all of the evidence, without selecting as the request does, particular items of the evidence, and directing the jury to consider them, a method always objectionable and sometimes erroneous. The instruction upon this phase of the case taken as a whole is admirable, and was quite as favorable to the defendant as the law warrants.

13. It is last urged that there is no law in this state authorizing the infliction of the death penalty. This question was before this court since defendant's brief was filed, and was decided adversely to defendant's contention: *State* v. *Rathie,* 101 Or. 339 (199 Pac. 169); *Ex parte Kerby,* 103 Or. 612 (205 Pac. 279).

Finding no reversible error in the record, the judgment is affirmed.                         AFFIRMED.