Argued and submitted September 5, 1989, the judgment affirmed as to the guilt phase and reversed as to the penalty phase and the case remanded to the circuit court for resentencing April 3, 1990

## STATE OF OREGON,
*Respondent,*

*v.*

## MARCO ANTONIO MONTEZ,
*Appellant.*

## (TC C8708-34702; SC S35291)

789 P2d 1352

Paul J. De Muniz, Salem, argued the cause for appellant. With him on the briefs were Susan G. Bischoff and Garrett, Seidemen, Hemann, Robertson & De Muniz, P.C., Salem.

Jonathan Fussner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the response were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, Ann Farmer Kelley and Brenda J Peterson, Assistant Attorneys General, Salem.

Before, Peterson, Chief Justice, and Linde,* Carson, Jones, Gillette, Van Hoomissen and Fadeley, Justices.

VAN HOOMISSEN, J.

The judgment is affirmed as to the guilt phase and is reversed as to the penalty phase, and the case is remanded to the circuit court for resentencing consistent with this opinion. *See State v. Wagner,* 309 Or 5, 786 P2d 93 (1990); *see also Penry v. Lynaugh,* 492 US ___, 109 S Ct 2934, 106 L Ed 2d 256 (1989).

Gillette, J., dissented and filed an opinion, in which Fadeley, J., joined.

Fadeley, J., dissented and filed an opinion.

---

* Linde, J., retired January 31, 1990.

## VAN HOOMISSEN, J.

This is an automatic and direct review of a judgment of conviction of aggravated murder and sentence of death. ORS 163.150(1)(f). Defendant seeks reversal of his conviction for aggravated murder. Alternatively, he requests this court to vacate his death sentence. We affirm defendant's conviction of aggravated murder. We reverse the trial court's judgment as to defendant's sentence and remand this case for resentencing. *See State v. Wagner*, 309 Or 5, 786 P2d 93 (1990); *see also Penry v. Lynaugh*, 492 US ___, 109 S Ct 2934, 106 L Ed 2d 256 (1989).

## I. SUMMARY OF FACTS

On June 20, 1987, Candice Straub, accompanied by two men, rented a room at the Continental Motel in Portland. The next day, firefighters responding to a fire at the motel discovered Straub's nude and bound body on a bed in one of the motel's rooms. Her body had been doused with flammable liquid and set afire. It was determined later that she had been strangled to death.

A few weeks later, defendant Marco Montez told Annie Edmo, a woman with whom he had been living in Pocatello, Idaho, that he had helped get rid of the body of a woman in Portland after Tim Aikens, the co-defendant in this case, had strangled her. Edmo reported that statement to the Pocatello police. Defendant was arrested in Pocatello on July 12 on unrelated Idaho charges. The Pocatello police notified the Portland police of his arrest and of Edmo's report.

Portland Detective Goodale flew to Pocatello to interview defendant. On July 15, after introducing himself to defendant, Goodale handed defendant a constitutional rights (*Miranda*) advice form, which defendant read. Goodale then read the form to defendant, stopping after each of the four individual *Miranda* rights, to ask defendant if he understood. Defendant responded that he did, and he initialed the form beside each right as Goodale read it to him. Defendant stated that he understood his rights and that he would speak to Goodale. He signed the advice of rights form. Defendant does *not* dispute that he was advised of, understood, and voluntarily waived his *Miranda* rights before talking to Goodale for the first time on July 15.

In response to Goodale's questions, defendant at first denied any involvement in Straub's murder. He stated that he had met Aikens in Portland and that they had worked together for a day at a cannery. Aikens had met Straub at the cannery, and she had accompanied Aikens and defendant to a drop-in center in Portland when they returned from work. After sleeping for a few hours, the three went to breakfast and to a second hand store before separating. Aikens and Straub went to the Continental Motel; and defendant went to a park, where he remained until Aikens contacted him later. At that time, Aikens told defendant that he had left Straub at the motel and that he wanted to show defendant something there. Defendant, however, declined to go to the motel. Aikens then said that he had a "problem," after which defendant and Aikens then made plans to leave town.

Goodale asked if Aikens had explained the nature of his "problem." Defendant replied, "I think I need a lawyer to talk about the rest of it so I don't get linked up." Goodale asked defendant if "he was telling us that he wanted an attorney and did not want to talk with us anymore." Defendant's reply was no. Goodale again advised defendant that he had the right to have a lawyer and to have his lawyer present at any time during the questioning. He asked defendant "if that's what he wanted?" Defendant replied that "that was not what he wanted." Goodale asked defendant if he was "still willing to talk with us?" According to Goodale, defendant replied, "I will talk to you without one."

In response to further questions by Goodale, defendant admitted that he had gone to the motel, where Aikens had showed him Straub's dead body in the bathtub. Aikens told defendant that Straub had refused to have sex with him, that he had hit her, and that she had fallen and hit her head. Defendant stated that he had then left the motel. Defendant stated that Aikens had later admitted setting the motel room afire. Defendant at first denied involvement in the fire, but he later admitted that he had helped Aikens move Straub's body from the bathtub to a bed and had participated in setting the motel room afire. Defendant admitted that it had been his plan to burn the room, but he still denied killing Straub or having sexual relations with her.

Defendant voluntarily submitted to polygraph tests

on July 16 and 17. When the polygrapher told defendant that the tests indicated deception, defendant told the polygrapher that he did not want to talk to him anymore, and the polygrapher turned defendant back over to Goodale.

Goodale resumed his questioning of defendant. Defendant related more incriminating details about Straub's death, although he still insisted that Aikens alone had killed her. Defendant then returned to his cell, but shortly thereafter he asked a jailer to tell Goodale to return and "to bring his tape recorder."

When Goodale arrived, he again advised defendant of his *Miranda* rights. Defendant then admitted that he had participated in Straub's murder. He stated that he and Aikens had beaten, raped, and sodomized Straub and that when she had resisted, Aikens pushed his fist into her anus causing her to bleed profusely. They then tied Straub's arms and legs behind her back and gagged her and put her in the bathtub. Defendant stated that he and Aikens became concerned that Straub might report them to the police, and they decided to kill her. After looping a towel around Straub's neck, each man pulled one end until she was dead. They then placed her body on the bed, doused it with lighter fluid, set it afire, and left. Defendant admitted that they burned the motel room to destroy any evidence that could link them to the crime.

Defendant then asked if Goodale knew what would happen to defendant in Oregon. Goodale explained the Oregon homicide laws. Defendant then said that he was willing to plead guilty to murder but hoped that he would not be sentenced to death.

On August 28, Goodale again spoke with defendant, who stated that Straub had been conscious when he and Aikens carried her into the motel bathroom and placed her in the bathtub. He also admitted that he rather than Aikens had placed his fist in Straub's anus.

### Indictment

Defendant was charged with three alternative counts of aggravated murder.[1] The state's three theories of guilt were

---

[1] Defendant also was charged with Arson in the First Degree (ORS 164.325) and Abuse of a Corpse (ORS 166.085). He was convicted of both crimes and sentenced. Those convictions and sentences are not at issue in this appeal.

that defendant and Aikens had intentionally killed Straub: (Count I) to conceal their identities as perpetrators of the crimes of first degree kidnapping, first degree rape, first degree sodomy, first degree sexual abuse, and fourth degree assault; (Count II) in the course of intentionally torturing her; and (Count III) in the course of and in the furtherance of first degree kidnapping, first degree rape, first degree sodomy, and first degree sexual abuse.

During his opening statement, defendant's counsel told the jury that "Mr. Montez does not deny that he participated and that he aided in the strangulation death of Candice Straub," and that "There is no doubt that Mr. Montez participated in, with Timothy Aikens, in strangling Candy Straub." Defendant's counsel explained that he would try to persuade the jury that there *was* doubt that defendant had committed rape, sodomy, kidnapping, sexual abuse or assault, and that there was no evidence that Straub had been "tortured." Counsel concluded, "[w]e will submit to you that Mr. Montez is in fact guilty of * * * Murder. He is not guilty of Aggravated Murder, despite what he said himself, he is not guilty of that particular offense. * * * [W]hen we get done with this case and we've discussed these matters of sex and violence and rape and sodomy and all those other unspeakable kinds of things, you'll find Mr. Montez guilty of Murder. He's not guilty of Aggravated Murder."

During closing argument, defendant's counsel again told the jury that defendant did not deny that Straub was strangled to death, but he argued that defendant's act had been the result of "a drunken mistake." He argued that defendant had wanted to come back to Oregon from Idaho to plead guilty to aggravated murder and to take the consequence for what he had done. He reminded the jury that defendant had denied raping Straub and that there was no independent evidence of sodomy, and he argued that the state had failed to prove that Straub had been "tortured." Counsel's opening statement and closing argument fairly can be characterized as asking the jury to find defendant guilty only of murder, but not guilty of "aggravated" murder. Defendant did not testify at his trial.

Defendant was convicted on all three counts of aggravated murder in the guilt phase of his trial. In the penalty

phase the jury affirmatively answered two of the questions posed by ORS 163.150(1)(b)(A) and (B).[2] Thereupon, the trial court entered a sentence of death pursuant to ORS 163.150(1)(f) [*former* ORS 163.150(1)(e)].

## II. ASSIGNMENTS OF ERROR

### A. Guilt Phase

Defendant makes fourteen assignments of error relating to the guilt phase of his trial. We will discuss each assignment to the extent we deem necessary.

### Motion to Suppress

■ Defendant first contends that the trial court erred in denying his motion to suppress statements he made to Detective Goodale beginning on July 15, 1987. He argues that Goodale violated defendant's right to counsel by continuing to question him after he had asserted his right to counsel. He primarily relies upon *Edwards v. Arizona,* 451 US 477, 101 S Ct 1880, 68 L Ed 2d 278 (1981) and *State v. Kell,* 303 Or 89, 734 P2d 334 (1987), which held that *Edwards* is applicable to Article I, sections 11 and 12, of the Oregon Constitution.

The trial court made the following findings of fact:

"1. All of * * * Montez['s] * * * statements were made freely and voluntarily.

"2. Portland Police Bureau Detective Joseph Goodale did not make any promises or threats to induce * * * Montez * * * to make statements.

"3. Defendant Montez did not request an attorney in an interview with Portland Police Bureau Detective Joseph Goodale on July 15, 1988 [*sic*]. Defendant Montez's remarks regarding an attorney were equivocal and Detective Goodale's subsequent questions were a reasonable inquiry whether or not Montez wanted an attorney. In defendant Montez's subsequent statements, he unequivocally said he did not want an attorney."

We are bound by the trial court's finding of historical fact. *State v. Foster,* 303 Or 518, 529, 739 P2d 1032 (1987); *State v. Herbert,* 302 Or 237, 241, 729 P2d 547 (1986).

---

[2] Defendant made no claim of provocation by his victim. Therefore, the third question, ORS 163.150(1)(b)(C), was not submitted to the jury.

The trial court ruled:

"THE COURT: * * *

"I will suppress all the matters in connection with the two lie detector matters. And that is all I will suppress as to the raising of the questions by Counsel for Mr. Montez. I consider that highly equivocal.

"And I approve the examination that was conducted by Officer Goodale to determine what it was and affirm him and his right to go ahead, that it was not in fact a request for counsel. And I'm satisfied that all of the other statements were freely and voluntarily made after appropriate advice of rights."

When a suspect in custody unequivocally requests to talk to a lawyer, that request must be granted and further questioning must cease. *State v. Isom,* 306 Or 587, 592-93, 761 P2d 524 (1988); *State v. Kell, supra,* 303 Or at 95-96. The *Edwards* rule is prophylactic; it is designated to protect a suspect in custody from being "badgered" by the police. *Oregon v. Bradshaw,* 462 US 1039, 1044, 103 S Ct 2830, 77 L Ed 2d 405 (1983). However, after a suspect in custody asserts the right to counsel, the suspect is free to waive that right. *State v. Kell, supra,* 303 Or at 96-99; *Connecticut v. Barrett,* 479 US 523, 527-30, 107 S Ct 828, 93 L Ed 2d 920, (1987); *Moran v. Burbine,* 475 US 412, 420-21, 106 S Ct 1135, 89 L Ed 2d 410 (1986).

The trial court found as fact that defendant's statements were freely and voluntarily made, that Detective Goodale made no promises or threats to induce defendant to speak, that defendant did not request a lawyer on July 15, and that defendant's remarks regarding an attorney were "equivocal." The court also found as fact that Goodale's subsequent questions were "a reasonable inquiry whether or not Montez wanted an attorney." There is evidence in the record to support the trial court's conclusions.

We agree with the trial court that defendant did not "unequivocally" request to talk to a lawyer. Goodale's questions seeking clarification of defendant's intent, therefore, were permissible and did not constitute further "interrogation" or "badgering." Goodale's neutral questions, intended only to clarify whether and to what extent defendant was

invoking his right to counsel, did not probe beyond that limited and permissible inquiry.

Having determined that defendant was not asking to talk to a lawyer at that time, Goodale again advised him that he had the right to have a lawyer and to have his lawyer present at any time during the interview. Goodale then asked defendant "if that's what he wanted." Defendant replied that "that was not what he wanted." Goodale then asked defendant if he was "still willing to talk to us." Defendant replied, "I will talk to you without one."

■ The trial court found that defendant had "unequivocally said he did not want an attorney" and implicitly concluded that defendant had waived his right to counsel. We agree with that conclusion. *Edwards* does not require suppression of any of defendant's statements. Defendant's motion to suppress, therefore, was properly denied.[3]

### Voir Dire

Defendant next contends that the trial court erred during *voir dire* in excluding prospective jurors Don Muench and Mary Kavet, both of whom had expressed opposition to the death penalty, and in denying defendant's motion to exclude for cause prospective jurors Michael Boley and Vern Olson, both of whom had expressed support for the death penalty. He argues that in excusing jurors Muench and Kavet and in refusing to excuse jurors Boley and Olson, the trial court denied him his right to an impartial jury in violation of Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments of the United States Constitution.

Challenges for cause based on actual bias are governed by ORCP 57D(1)(g).[4] That rule provides:

---

[3] Because we find that defendant's July 15, 1987, statements were admissible, we need not address his argument that his subsequent statements were "poisoned" by his earlier statements. *See State v. Mendacino,* 288 Or 231, 237-39, 603 P2d 1376 (1979) (coercive conditions resulting in earlier confessions not removed). For the same reason, we need not address the state's argument that defendant voluntarily initiated further questioning on July 17, 1987, when he asked a jailer to tell Goodale to return and to bring his tape recorder.

[4] ORCP 57D(1)(g) is made applicable to criminal trials by ORS 136.210(1). *State v. Nefstad,* 309 Or 523, 527-28, 789 P2d 1326 (1990).

"Challenges for cause may be taken on any one or more of the following grounds:

"* * * * *

"*Actual bias, which is the existence of a state of mind on the part of the juror, in reference to the action, or to either party, which satisfies the court, in the exercise of a sound discretion, that the juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.* A challenge for actual bias may be taken for the cause mentioned in this paragraph, but on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon the merits of the cause from what the juror may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but *the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.*" (Emphasis added.)

■ The general rule for testing error in this respect is whether the prospective juror's views would prevent or substantially impair the performance of the duties of the person if selected as a juror. *State v. Wagner,* 305 Or 115, 175, 752 P2d 1136 (1988); *see Wainwright v. Witt,* 469 US 412, 424, 105 S Ct 844, 83 L Ed 2d 841 (1985) (whether the juror's views prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath); *Adams v. Texas,* 448 US 38, 44, 100 S Ct 2521, 65 L Ed 2d 581 (1980) (in capital cases, states have interest in retaining jurors who can and will follow instructions in determining sentence).

In the quest for jurors who will conscientiously apply the law and find the facts, the question is whether the juror is capable of "trying the case fairly and impartially upon the evidence adduced in court." *State v. Brumfield,* 104 Or 506, 529, 209 P 120 (1922); *see State v. Moen,* 309 Or 45, 93, 786 P2d 111 (1990) (proper role of jurors is to reach a reasoned decision based solely on the evidence before them); *Holland v. Illinois,* ___ US ___, ___, 110 S Ct 803, 107 L Ed 2d 905, *reh'g den* ___ US ___, 110 S Ct 1514, 108 L Ed 2d 650 (1990). (Sixth Amendment's goal is jury impartiality; neither defendant nor state should be favored); *Wainwright v. Witt, supra,* 469 US at 432.

■■ Whether a juror is actually biased or not is a question of fact to be determined by the trial court in the exercise of its

discretion. ORCP 57 D(1)(g). That court has the advantage, which we lack, of seeing the challenged prospective juror and observing the juror's demeanor, apparent intelligence and candor, all of which are factors in the trial of a challenge for cause. *State v. Brumfield, supra,* 104 Or at 528. The trial court's judgment as to a prospective juror's ultimate qualifications is entitled to great weight. The court's decision will not be disturbed absent a finding of an abuse of discretion. *State v. Nefstad,* 309 Or 523, 528-29, 789 P2d 1326 (1990);[5] *Lambert v. Srs. of St. Joseph,* 277 Or 223, 229, 560 P2d 262 (1977); *State v. Brumfield, supra,* 104 Or at 528-29; *Wainwright v. Witt, supra,* 469 US at 424-26.

A prospective juror's approval of or opposition to the death penalty alone is not determinative of whether the juror may serve as a juror or must be excused. The question is whether the prospective juror's views would prevent or substantially impair the performance of his or her duties if selected as a juror. *State v. Nefstad, supra,* 309 Or at 536; *State v. Wagner, supra,* 305 Or at 175; *State v. Leland,* 190 Or 598, 625, 227 P2d 785 (1951) *aff'd* 343 US 709 (1952); *Wainwright v. Witt, supra,* 469 US at 424. However, it is not enough that a prospective juror believes that he can be fair and impartial. The trial court in exercising discretion must find from all the facts that the juror will be impartial and fair and not be consciously or unconsciously biased. The test of a juror's disqualification is the probability of bias or prejudice as determined by the court. *Lambert v. Srs. of St. Joseph, supra,* 277 Or at 230.

We emphasize that in exercising its discretion, the trial court must always be zealous to protect the rights of the accused as well as the legitimate interests of the state. *Lambert v. Srs. of St. Joseph, supra,* 277 Or at 230; *Lockhart v. McCree,* 476 US 162, 175, 106 S Ct 1758, 90 L Ed 2d 137 (1986); *Wainwright v. Witt, supra,* 469 US at 429-30.

### Juror Muench

Don Muench stated essentially that he had moral and

---

[5] In *State v. Nefstad, supra,* 309 Or at 528, we explained that this court does not review *de novo* a trial court's ruling on a challenge based on actual bias. We accord great weight to a trial court's finding of fact as to whether a prospective juror can try a case impartially.

religious feelings that would make it impossible for him to follow the law on the death penalty. He repeatedly stated that he thought life imprisonment was a more appropriate sentence for aggravated murder. His juror's questionnaire asked:

> "Do you have such strong feelings on the question of imposition of the death penalty in the second [penalty] phase of the trial that you would be unable to be fair and impartial?"

Muench answered the question, "Don't know."

On his questionnaire, Muench stated that he "disagree(d)" with the following statements:

> "(c) I could vote for the death sentence in some cases if I were on a jury."

Although Muench also stated that he thought he could be fair and impartial, the prosecutor challenged him for cause, and the trial court excused Muench. The court was not persuaded that juror Muench would be fair and impartial or that he would be able to vote for the death penalty. The court stated:

> "THE COURT: He's answered the questions on both sides of the coin a couple of times.
>
> "* * * * *
>
> "THE COURT: I'm frankly at a loss to know what his position is. His answers seem to accommodate the question.
>
> "* * * * *
>
> "THE COURT: But he's answered other questions that indicate that he might not be able to impose the death penalty because of his personal and religious beliefs.
>
> "* * * * *
>
> "THE COURT: Well, I'm of the opinion that I'm going to allow the challenge. This is a very serious question and I think his answers cancel each other out."

There is evidence in the record to support the trial court's determination that Muench's views would prevent or substantially impair his performance as a juror. We find no error.

## Juror Kavet

■ Mary Kavet was not excused because of her opposition to the death penalty. The record shows that she was excused for cause because she stated that she did not want to see or hear any gruesome evidence depicting violence. She stated that she "couldn't handle a case like this," that she would be "impaired in listening to the evidence," and that she did not think she could be fair to defendant or to the state. Because of the nature of the crimes charged, the evidence to be introduced at trial necessarily included gruesome evidence of violent crimes. Defendant and the state were entitled to have every juror hear and consider all the relevant evidence.

The prosecutor challenged Kavet for cause because of her expressed unwillingness to view and consider relevant evidence that she found objectionable, and the trial court excused her for that reason. There is evidence in the record to support the trial court's determination that Kavet's views would prevent or substantially impair her performance as a juror. We find no error.

## Juror Boley

Defendant argues that prospective juror Michael Boley was unsuitable as a juror because (1) of his views favoring the death penalty, (2) because he was personally biased against defendant because he knew someone who had been murdered, and (3) because he held some incorrect views of the law. Defendant challenged Boley peremptorily. Because Boley did not serve on the jury, the only "prejudice" to defendant was that defendant had no remaining peremptory challenge to later excuse Paul Brown, who did serve on the jury.

■ At the risk of being prolix, we quote those portions of Boley's 55-page *voir dire* examination which the parties and this court deem relevant:

"* * * * *

"EXAMINATION BY MR. GROVE [defendant's counsel]:

"Q Okay. Do you know what kind of case that we're dealing with here today?

"A Yes, I do.

"Q You know that Mr. Montez is charged with aggravated murder, three counts of aggravated murder?

"A Yes.

"Q And I need — I'm going to ask you some things now and maybe some things later about the death penalty, okay? And I want you to understand it's awkward for me to do that, to talk about a potential penalty before there's ever been a finding of guilt in regard to the potential charges. So the fact that I'm talking to you about the death penalty doesn't have anything to do with my belief about Mr. Montez' guilt.

"A Okay.

"Q I think you had indicated you think our society would be better if the death penalty were imposed more often?

"A Yes.

"Q And you strongly agreed with that particular proposition, that society would be better off. And I'm wondering what your thoughts are on that in terms of how you think society would be better if we executed more people. What would be actually accomplished by doing that?

"A Well, I think more people would be less apt to do such crimes. You know, you do the crime or do the type [sic] situation, from what I've heard, people would be less apt to do them. They would see that it wasn't a good thing to be, you know, going out and committing murder or what have you, and there is a stiffer penalty for that. And I just feel that they should do more of it.

"There's a lot of people on death row that sit there for years and years and years and that's tax money going away, you know. Maybe some aren't guilty. A lot probably are and I think maybe they should start doing a little more of it right now.

"Q So you think there's a deterrent effect?

"A Yes, I do.

"Q Okay. Anything else?

"A No. I mean, some people, I mean, you know, that commit really brutal murder and stuff, I think they should be done away with the same as they did to the person they murdered or something.

"Q You're a strong supporter of capital punishment; is that right?

"A Yes.

"* * * * *

"Q And in your questionnaire you said most murderers ought to receive the death penalty?

"A (Witness nods head) I believe that. Extenuating circumstances, though, I mean, you know, a lot of things might be like in a self-defense-type thing maybe, you know. Murder of mercy where an older gentleman might, you know, help his wife along to meet her goal sooner than, you know, she might, if she's laying there dying in bed or something like that. But they are often found as murderers, but I think he's just helping a loved one at that point. Maybe there ought to be different penalties for that, but it's still taking a life, I feel.

"Q What kind of steps would be imposed in a situation like that, a mercy killing?

"A Well, again, it depends on the circumstances. Like a mercy killing, I guess, you know, there should be some kind of penalty. You shouldn't take people's lives, but then again, it shouldn't be as stiff as to be executed or something. I mean, there I can see maybe a couple years in prison or something. You know, parole in seven years, I don't know. I can't really say.

"* * * * *

"Q Now, you have feelings, if I understand you correctly, that unless there's some kind of what you call extenuating circumstance, that the death penalty ought to be imposed; is that right?

"A Yes.

"Q Upon a conviction for murder?

"A Yes, sir, that's true.

"Q For aggravated murder.

"Well, let me ask you this: Would you automatically impose the death penalty on a conviction for murder if there were not extenuating circumstances you described?

"* * * * *

"[PROSECUTOR]: Your Honor, I object to the form of the question. I think the juror is entitled to know what the law is. The question is whether he can follow the law. I would ask that Counsel read the statute to the juror so that he can answer that question.

"THE COURT: Because he wouldn't have the power to sentence if it were a straight murder anyway.

"MR. GROVE: I am inquiring about attitudes, which I think is within the permissible scope of *voir dire.*

"THE COURT: I think you can do *voir dire* but [I] think that's an incorrect question.

"MR. GROVE: All right.

"BY MR. GROVE: (continuing)

"Q Would it be your opinion — let's talk about your personal belief. Would it be your opinion that upon a conviction for murder, if there was no extenuating circumstances as you described them, that the death penalty automatically should be imposed?

"A No, I guess not. If there were other circumstances, then possibly, yes.

"Q How about upon a conviction for aggravated murder?

"A I believe so, yeah.

"Q That the death penalty automatically should be imposed unless there were extenuating circumstances?

"A I believe so, yeah.

"Q Now, as I explained to you, the death penalty isn't automatically imposed on conviction. Okay?

"A Yeah.

"Q If there is a conviction for aggravated murder — let me go over this with you — then the State has the burden of proving beyond a reasonable doubt that the answers to the three question ought to be yes. Okay? These are the three questions. Let me go over those with you, if I could.

"A, whether the conduct of the defendant that cause the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result, okay?

"B, whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? Do you understand that one?

"A Yes.

"Q And C, if it's raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. Do you follow that one?

"A Can you read that one again?

"Q Sure.. If it's raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

"A Okay.

"Q You got that?

"A Yeah.

"Q Do you have any particular feeling about the fact that the death penalty is not automatically imposed upon a conviction for aggravated murder?

"A Not really. I feel that it should be, but, you know, the majority of the people have to vote it in, I guess. I don't really see why it's not actually.

"Q Okay.

"As I indicated here, if there's a conviction for aggravated murder, okay, then the jury is given — there's evidence taken again, okay? And these three questions are submitted to the jury, okay? Each of those questions has to be proved beyond any reasonable doubt before the jury can answer yes to those questions, and they have to — unanimously have to answer yes to those questions, okay?

"A Okay.

"Q If you were a juror in this case, would you be able to set aside you personal opinion, your personal feeling, about imposition of the death penalty in a situation like this?

"A Yes, I believe I could.

"Q Okay. How difficult would it be for you to do so?

"A Well, probably not too difficult, but there's still that little part of you that might think, well, that you would like to see something happen more than might happen. I don't know. I guess that's all I can say.

"Q Okay. And the reason I'm asking these questions is that your questionnaire, your responses to the questions indicate that you're a real strong supporter of the death penalty, okay? And you also expressed at one time that your were at least kind of a believer in the principle of an eye for an eye?

"A Yeah.

"Q If you kill it's okay for you to be killed. Is that basically what it is?

"A Yes.

"Q Okay. So the reason I'm asking these questions is to

determine whether or not you think you could be fair in a case like this given your personal feelings, your strong personal feelings.

"A I think I could, but, you know, some points it might be a little difficult, yeah.

"Q Okay

"A I mean, I don't know — yeah, I think I could. See, my — well, I don't know — Dave's mother ran a halfway house for the people coming out of prison, okay? She lived up just below Portland Community College.

"Q Which campus?

"A Sylvania campus. She was a schoolteacher. My nieces's [sic] grandmother. And she loaned people money that was in this halfway house that she was helping some of Dave's friends that got out of prison. Well, she wouldn't loan one of them money one time, and he came in and murdered her. Shot her several times with a shotgun and then burned her house down. So I couldn't believe that somebody would do that to a nice lady like that.

"Q This was your mother-in-law?

"A No, this was my neice's [sic] grandmother, Dave's [Sterling's] mother. And they — I guess they finally did catch the guy. I never knew what eventually happened to him or anything, but I felt really bad about it. I felt that he should have got the death penalty. Whether or not he did, I have no idea.

"Q Do you know what his name was?

"A No, I have no idea.

"Q Do you know how long ago this was?

"A It was about three to four years ago, I believe.

"Q Okay. But you think the guy got caught?

"A I know he got caught.

"Q Did you know the lady that got murdered?

"A Yes, I did.

"Q How well did you know her?

"A Fairly well. I did yard work for her and helped her around the house. Her husband wasn't around. Dave obviously was in jail. So we helped her around the house. She was a very independent woman and she was a schoolteacher, like I said, and friends in the community. It was a pretty tragic

thing to have happened, and my neice [*sic*] was at school and some little kid came up and said that to her, I mean, your grandma is dead, somebody murdered her. What a way to find out. I think deep down inside it hurt her a lot harder than she ever made out to be, but I'm sure she still carries that today.

"Q How about you? Do you still carry feelings about this?

"A Yeah.

"Q Rage kind of stuff?

"A Well, just angry that somebody she was being a friend to and trying to help in his life, whether it be — whether he was really that bad or good, that he would come back and do something like that over just money. It was pretty tough.

"Q In that situation, did anything else happen besides murder and robbery?

"A Well, they burned down the house, I guess, to mask their crime.

"Q How old was she?

"A I believe she was 61, 59, 60, somewhere right in there.

"Q Okay. She was shot to death before the house was burned?

"A Yes, she was.

"Q Is there any possibility that your feelings of anger about that are going to come out in this case, if you're chosen as a juror?

"[PROSECUTOR]: Once again, Your Honor, I object to the form of the question. The question is whether or not this juror will be able to follow the law.

"THE COURT: Well, no, I think this is an appropriate question, * * *. Go ahead.

"BY MR. GROVE: (continuing)

"Q Is there any possibility that your feelings of anger about that situation would come out in this case?

"A I would follow the law the best I could, but, you know, there's a possibility in revealing evidence and stuff like that that I saw pictures or whatever have you, you know, it's just that click my brain that, yeah I might. I'm not sure but, yeah, there's a possibility.

"Q Okay. Let me go back a little bit, okay, and put it to you this way, okay? *There may be evidence in this case,* okay,

*that would be of a nature that could make you angry,* okay? And more particularly this case involves the murder of a young lady on June 21st of last year who was found in the Continental Motel. Have you ever heard about this Continental Motel before?

"A I don't even know where it's at, no.

"Q At any rate, *the crime scene was such that they found her body,* okay. *She was bound with her hands and feet tied behind her, hog-tied is the term that's used for that,* okay?

"A Okay.

"Q *She was gagged. She had some bruises on her head. She had been sexually abused by having an object placed in her rectum with force,* okay? *Strangled to death, and after that had happened, burned.* Okay. *After she was dead.* All right? It's the kind of evidence that, taken by itself, even without any personal experience, could make a person angry."
(Emphasis supplied.)

This was not a question, but a recitation of fact. The juror gave a perfectly logical answer which did not reveal any prejudice against defendant.

"A I can see how that would make a person angry, yes.

"Q The statute — if there's a conviction for aggravated murder in this case — I read you the statute and that statute talks about the kind of evidence or the kind of questions you have to answer and it doesn't talk about making a decision in anger.

"A Correct.

"Q Or for revenge or retribution or for any other reason.

"Now, the reason I *outlined that evidence* for you is that there's some similarities here, and the question is *given that particular situation* do you still think you could be fair?"
(Emphasis supplied.)

The question was patently improper. It asks the juror to comment in advance on how he would react to specific evidence. How is a juror to respond to a question which asks what the juror's reaction would be to evidence showing that the murder victim was a young woman who had been "hog-tied," gagged, beaten, sexually abused and strangled, and whose body thereafter had been burned in an attempt to destroy the evidence of criminal homicide?

"A It might be tough, yeah. That's kind of why I brought it up to you.

"Q Well, yeah, and I appreciate that.

"A It may be tough, yes. In all honesty, yeah.

"Q At some point, it may be that the Judge would instruct you to set aside your personal feelings, sympathy for the defendant or for the victim, your feelings of any bias you might have or any prejudice you might have, anger, feelings of retribution and that sort of thing, and make a decision based solely on the facts and the law as given to you by the Court. Do you think you'd be able to do that?

"A I think so.

"Q Okay. Is there a possibility you couldn't do that, given the situation that I've outlined?

"[PROSECUTOR]: Your Honor, I object to the form of the question. Possibility. I think we have gone through this before.

"THE COURT: Well, the standard, of course, would be probability, not possibility, because anything is possible."

We do not understand the trial court's comment. Inquiry as to possible bias is appropriate. However, the trial court immediately shifted gears and allowed inquiry into possible bias.

"MR. GROVE: Well, I understand that, but I think I'm entitled to explore that, at least in terms of — if not a challenge for cause, in terms of whether or not I want to exercise a peremptory challenge. I think those kinds of attitudes are proper for jury inquiry.

"THE COURT: Well, for that purpose I would allow it.

"BY MR. GROVE: (continuing)

"Q So does that possibility exist that you couldn't be fair and set aside you personal feelings?

"A Yes, there is.

"Q Is that more likely than not to happen?

"A I think I could be fair, but, you know, possibility that I might not be. You know, I always give the man the benefit of the doubt, I think, though. I know I'd want people to be fair with me, and I'll be fair with them.

"Q Well, you think the possibility exists that you might not be fair?

"[PROSECUTOR]: Your Honor, I object. This has been asked and answered.

"THE COURT: I think he's stated a specific answer to that specific question.

"BY MR. GROVE: (continuing)

"Q Let me rephrase it, then. How strong is that possibility?

"A I guess it could come up, yes. On a scale from one to ten, you know, a three, four.

"Q Okay. But as you sit there now, I guess I understand we're talking about a hypothetical question. Do you think that chance, just from what I've outlined to you, is less than 50/50 that could happen?"

Counsel has now converted a statement of fact into a question of reaction to fact, into a question of overall fairness. The juror may well have been equating his reaction of anger to fairness when he answered this last series of questions — how the juror would react to specific gruesome evidence and whether the juror can be fair if uncomfortable with such facts.

"A Yes.

"Q Okay.

"MR. GROVE: Your Honor, I would challenge the juror for cause, based on the fact that he's represented to us that there is a substantial possibility that he could not be fair in this case, and I think that the most graphic case of that was his last response in terms of the scale of one to ten. And I think that given the nature of this case, a challenge for cause would be appropriate at this time.

"THE COURT: Still think it's in the possibility area and is not sufficient for a basis of challenge. I understand your position."

If the question was whether juror Boley would give defendant a fair trial, rather than whether reaction to specific evidence might affect his verdict, a possibility of unfairness of 3 or 4 on a scale of 10 casts sufficient doubt on Boley's ability to be fair as to warrant a right to defendant to have Boley excused for cause. The *voir dire,* however, did not stop here.

Boley thereafter specifically answered that he would

follow the court's instructions and be fair to both the defendant and the state and he retreated from his earlier position of doubt.

"* * * * *

"Q One of the principles that we may be dealing with is that you can't convict a person based solely on a confession, okay?

"A Okay.

"Q There has to be some independent evidence that the crime occurred, all right?

"A All right.

"Q Do you think you see the reason for a rule like that?

"A If he confessed then you have to have evidence to convict him?

"Q Independent evidence that the crime was committed, that the crime occurred.

"A I feel if somebody confesses, I mean, you know, they did the crime that that's how I feel.

"Q Okay. Let me — maybe I can go through this with you and show you how it applies. If somebody walks into a police station and says I committed a murder, okay, you can't convict a person based solely on that statement.

"A Okay, I can see that.

"Q You've got to have a body, okay?

"A Yeah.

"Q If somebody says I committed rape, there has to be some independent evidence that that crime occurred or sodomy or kidnapping, sexual abuse, okay?

"A I understand.

"Q Are you following me on that?

"A Yeah.

"Q So even though you may feel otherwise, do you think you'd be able to set aside your personal feelings and follow the law as given to you, if — as I've outlined it to you?

"A Yes.

"Q If in fact that law is given to you by the Judge?

"A Yeah, I believe I could.

"* * * * *

"Q Okay. Now, I think you probably understood from looking at the questionnaire and from what Judge Crookham told you, that in a trial of this nature there are potentially two phases. The first has only one purpose, the first phase of the trial. That's to determine whether or not the person is guilty or innocent —

"A Right.

"Q — of the crimes — of the crimes. In that situation, in that phase of the trial, in both phases of the trial, the State has the burden of proving each element of each offense beyond any reasonable doubt. Do you agree with that?

"A I agree that's what it should be.

"Q The other — one of the other principles that we deal with in a criminal trial is that a person who's accused of a crime and chooses to have a trial has no obligation to testify in that trial, okay? And you can't hold that against him as any evidence of guilt.

"A Okay.

"Q Can you do that?

"A Yes.

"Q Okay. Do you think there might be good reasons why a person wouldn't testify at his own trial that have nothing to do with guilt or innocence?

"A No, I don't see why, I mean, why he wouldn't testify.

"Q Okay. Would you be able to set aside that particular question in your mind and simply follow the Judge's instruction, if he instructs you that you're not to consider that in determining whether or not he's guilty or innocent?

"A Yes, I could.

"Q Okay. You're sure?

"A To the best of my knowledge, yes, I think I could.

"Q Okay. And the reason I ask you this, that's a constitutional right, okay? That's one that's been around for 200 years. There's never been in a criminal trial or obligation on the person accused to explain. The burden is always on the State to prove his guilt, okay?

"A Yeah.

"Q If there's a conviction on any of those counts of aggravated murder, okay, then there would be the second trial. I've gone over that with you, okay? We start — well, you can use the evidence from the first trial, but the burden doesn't

change at all. It's still on the State to prove beyond a reasonable doubt that those questions should be answered yes. Do you disagree with that in any way?

"A No. I still think the State should have to prove it.

"Q I beg your pardon?

"A The State should have to prove —

"Q So if we got to that phase of the trial, you'd put the State to their proof. You wouldn't switch the proof and say, well, this guy has been convicted of aggravated murder, he should prove to us why he should not get the death penalty?

"A Yeah, I think I could do that. I mean, I think the State should still have to prove it, yeah. I don't think I would switch my — if he was convicted of being guilty, I wouldn't say the other way, like he should have to prove that he shouldn't get the death penalty or a hundred years or whatever it would be, life imprisonment.

"\* \* \* \* \*

"Q Okay. The reason I ask you that is when we first started off when we were talking about crime in general, you said something about, well, I don't think people should be going down for murder for seven years, and it may be that a life sentence on a conviction for aggravated murder is something much different from what your personal understanding might be, okay? And it may also be that if you get to that particular [penalty] phase of the trial and you have to make that decision, that the Judge would instruct you to set aside any personal belief you might have about the meaning of a life sentence and not consider matters of parole or work release, things like that.

"Do you think you'd be able to do that?

"A Yes, I think so.

"Q Is there any possibility you wouldn't be able to?

"A No.

"\* \* \* \* \*

"Q Would you be willing to listen to [mitigating] evidence if there was any?

"A Yes.

"Q And consider it as being mitigating?

"A Yes, I could, yes.

"Q I mean, would you give that a fair amount of weight?

"A Yes.

"* * * * *

"Q Some of the testimony in this case could come from police officers. Do you think you'd give them more credibility than any other witness?

"A No.

"Q In determining these questions under the death penalty statute, do you think the defendant's age should be considered?

"A No.

"Q If the Judge instructs you to consider his age, will you do that?

"A I guess if I was instructed to, yes.

"Q In making that kind of determination, the questions that I've outlined to you, talks about the extent and severity of the defendant's prior criminal conduct. Do you think that's something you ought to look at?

"A You mean what he did before that? Yeah. I suppose so, but it really shouldn't have any bearing on what he's being tried for. I guess the jury should know that, no.

"Q Before you impose the penalty, before you decide what penalty to impose?

"A No, I don't believe they should know that.

"Q If the Judge instructs you to consider [the extent and severity of defendant's prior criminal conduct], will you do it?

"A Yes.

"Q Okay. Now, in talking about the death penalty and maybe one thing I didn't quite ask you, do you think there are any crimes that the death penalty would be appropriate for where death didn't result, as a result of the crime itself?

"A No, I don't think so.

"Q Okay. You would only — you would reserve that only for the crime where death was a result of the crime?

"A Yes.

"* * * * *"

Defense counsel finally returned to the basic question of fairness:

"Q [By Mr. Grove] And I've outlined to you the nature of

this case and you have your own personal experience. Would you feel comfortable sitting as a juror in this case?

"A I don't know if I'd be comfortable, but yeah, I guess — I mean, I could do it. I mean —

"Q And if I understand your response, you probably could be fair?

"A Yes, I could be fair.

"Q But the possibility exists that you couldn't, given your experience and your feelings and what has happened before?

"A Yes.

"MR. GROVE: Your Honor, I have no further questions of the juror. I would renew my challenge for cause.

"* * * * *

"THE COURT: I will deny the challenge based upon my prior ruling."

The prosecutor then questioned Boley, eliminating any valid grounds for a challenge for cause.

"Q [By Prosecutor] * * * Are you prepared to take an oath as a juror and are you prepared to follow that oath and follow the law as instructed to you by the Judge?

"A Yes, I am.

"Q Is there anything that would prevent you from doing that, in following the law?

"A No.

"Q Okay. *And will you be fair to both sides, both to the defense and to the State?*"

Again the juror answered without equivocation.

"A *Yes, I would.*

"Q *Will you set aside your personal feelings?* You understand that we are trying this case, it doesn't have to do with any other cases that have happened in the past. *Are you prepared to follow the law and apply it to this particular case?*

"A *Yes, I would.*

"Q And can you set aside your personal feelings in doing that, in following the law?

"A Yes, I would. I would try to do the best I could." (Emphasis supplied.)

■ The fact that Boley favored the death penalty would not necessarily disqualify him from serving as a juror unless his views would have prevented or substantially impaired the performance of his duties as a juror. *State v. Nefstad, supra,* 309 Or at 526; *State v. Wagner, supra,* 305 Or at 175-76; *State v. Leland, supra,* 190 Or at 625. The question then is whether there is evidence in the record to support the trial court's conclusion that Boley could serve as a fair and impartial juror. There is such evidence.

Boley stated that the state should have the burden of justifying a death sentence, even after a defendant has been found guilty of aggravated murder. While describing himself as a strong supporter of the death penalty, he agreed that extenuating circumstances might make the death penalty inappropriate in a specific case. He stated that he always gives people the benefit of the doubt because if he were on trial, he would want people to be fair with him. He repeatedly stated that he could set aside any opinion he might hold and decide the case on the evidence, and that he would follow the trial court's instructions even when they conflicted with his previously held views. With regard to defendant's incriminating statements, Boley stated that he could set aside his personal feelings about the law and follow the court's instructions.

Boley volunteered the information about the murder of his brother-in-law's mother several years earlier without any prompting from defense counsel because he thought it might be relevant. He stated that he could set aside his personal feelings about that event and decide this case based on the evidence adduced at trial. Defense counsel's questions to Boley about whether certain evidence in this case might make Boley "angry" were objectionable because they asked for a specific comment on the evidence, *i.e.,* whether Boley would be angered by evidence that the murder victim was "hog-tied," "sexually abused," "strangled," and "burned." In context, Boley's responses to those improper questions appear appropriate; they gave no basis for disqualifying him as a juror.

■ Boley's *voir dire* examination does not establish that he was personally biased against defendant or that he was unable to follow the law. The trial court was entitled to believe, and obviously did believe, Boley's assertions of impartiality and that he would follow the court's instructions.

Boley's former views about the law were not grounds for excusing him for cause so long as he was able to follow the court's instructions as to the law. *See State v. Wagner, supra,* 305 Or at 175; *State v. Humphrey,* 63 Or 540, 548, 128 P 824 (1912).

Boley stated that on a scale from one to ten the odds were "a three, four" that he *could not be fair* and set aside his personal feelings. However, Boley subsequently stated that he would be able to set aside his personal feelings and follow the trial court's instructions. Again, he affirmed that the state had the burden of proof on both the guilt and penalty phases of the trial. He stated that he would not hold it against defendant if defendant chose not to testify, and that he would listen to and weigh any mitigating evidence. In response to questions from the prosecutor, Boley answered that he would set aside his personal feelings, that he would follow his oath as a juror and the court's instructions as to the law, and that he would be fair to both sides.

We conclude upon review of Boley's entire *voir dire* examination, that there is evidence in the record to support the trial court's determination that Boley could serve as a fair and impartial juror. The record supplies no basis for this court to conclude that the trial court's decision not to excuse Boley for cause was reversible error. We find no error.

Defendant used his eleventh peremptory challenge to remove Boley.

### Juror Olson

■ Defendant contends that the trial court erred in denying his motion during *voir dire* to excuse juror Vern Olson for cause. He argues that Olson admitted that he had read a newspaper story about jury selection after the court had instructed all prospective jurors to avoid media coverage of the case. Defendant argues further:

> "[J]uror Olson intentionally and voluntarily ignored the court's instruction. This lack of respect for and failure to comply with the court's instruction is *prima facie* evidence that the juror would ignore and disregard the court again, given the opportunity."[6]

---

[6] The trial judge stated that he had read the newspaper story in issue and that it contained nothing that the judge found prejudicial to defendant.

Olson stated that he recalled the trial court instructing prospective jurors not look at old news articles about defendant but that he had not realized that the instruction also applied to current media coverage about the trial. After admonishing Olson that it had instructed jurors to avoid *all* media coverage of the case, the court found that his conduct was merely a "technical breach," and it denied defendant's motion to excuse Olson for cause.

The record shows that the trial court implicitly accepted as truthful Olson's statement that he had not realized that the court's instruction applied to current papers. Thereby, the court also implicitly found that Olson had not intentionally disobeyed the court's instruction. Olson's unintentional breach of the court's instruction did not require dismissal for cause as a matter of law. There is evidence in the record to support the trial court's determination that Olson could serve as a fair and impartial juror and to support the court's denial of defendant's motion to excuse Olson for cause. We find no error.

Defendant used his twelfth and last peremptory challenge to remove Olson.

### Juror Brown

Defendant also contends that the trial court erred in denying his motion during *voir dire* to dismiss for cause police officer Paul Brown. Defendant cites numerous reasons why Brown should have been excused for cause, but none of them required that Brown be excused as a matter of law. We reject defendant's principal argument that "common sense and human experience" suggest that Brown, a police officer, could not serve as a fair and impartial juror in this case. As with any prospective juror, the inquiry is whether the officer can try the case impartially and follow the trial court's instructions. *State v. Wagner, supra,* 305 Or at 175.

Brown answered that he could set aside any personal prejudices and give defendant a fair trial. The trial court was entitled to accept that assertion of impartiality. The court implicitly found that Brown could conscientiously perform the duties of a juror if selected. Nothing in Brown's *voir dire* indicates that the trial court abused its discretion in refusing to excuse Brown for cause. We find no error.

Because defendant had already used his last peremptory challenge, Brown served on defendant's jury.

## Mistrial Motion

Defendant contends that the trial court erred in denying his motion for a mistrial on the ground of prosecutorial misconduct.

A motion for mistrial is addressed to the sound discretion of the trial judge, who is in the best position to assess and rectify the potential prejudice to the defendant. This court will reverse only when it can be said that the trial court has abused its discretion. *State v. Farrar,* 309 Or 132, 164, 786 P2d 161 (1990); *State v. Jones,* 242 Or 427, 433, 410 P2d 219 (1966); *State v. Hoffman,* 236 Or 98, 108, 385 P2d 741 (1963).

The following exchange occurred during the state's examination of Detective Goodale:

"Q Did he say — did he make any statements about how much truth or how much — how did he start talking about it?

"* * * * *

"A Montez repeatedly asked me to go interview Annie Edmo in Pocatello, and I asked Montez if he had had any anal sex with Annie and he denied doing that. I asked him if he had attempted to choke Annie —

"Q Detective, if you will please; please don't go into that.

"MR. GROVE: I object. I have a matter for the Court.

"THE COURT: Let's take about a ten-minute recess, ladies and gentlemen, for the afternoon. (Whereupon, the following proceedings were held in open court out of the presence of the jury:)

"* * * * *

"MR. GROVE: Your Honor, this is the third time at least that evidence of Mr. Montez' prior criminal conduct or prior conduct that could be considered criminal has been injected into this trial. I think that the nature of the last question, particularly when it related to a person not — who was not the victim in this case, one Annie Edmo, is so prejudicial that the Court has no choice but to grant a mistrial at this time and I would so move.

"* * * * *

"THE COURT: All right. Well, in view of the entire record, I'll deny the motion."

■ The state concedes that the relevant testimony was inadmissible at that stage of the trial. The prosecutor had recognized that fact, and he had immediately attempted to stop Goodale's testimony. Defendant does not argue that the prosecutor deliberately sought the objectionable testimony from Goodale. The prosecutor's question was not phrased to elicit such testimony, and the record shows that Goodale volunteered the testimony unexpectedly. On this record we find no prosecutorial misconduct and thus no error in the trial court' denial of defendant's motion.

## Indictment

Defendant contends that the trial court erred in denying his motion for a judgment of acquittal and oral demurrer on the ground that Count I of the indictment is not definite and certain and fails to state a crime. He argues that Count I fails to state the crime of aggravated murder because it does not allege all of the elements of the crime or crimes defendant intended to conceal.

■ Count I of the indictment alleged in part that defendant and Aikens

"did unlawfully and intentionally, in an effort to conceal the identity of Timothy Aikens and Marco Montez, perpetrators of the crimes of Kidnapping in the First Degree,[7] Rape in the First Degree, Sodomy in the First Degree, Sexual Abuse in the First Degree and Assault in the Fourth Degree, cause the death of another human being, to-wit: Candice Straub, by strangling the said Candice Straub to death * * *"

ORS 132.550(7) provides that an indictment must contain:

"A statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended; * * *"

In *State v. Cohen,* 289 Or 525, 529, 614 P2d 1156 (1980), we stated that the functions of an indictment are:

---

[7] On defendant's motion, the trial court dismissed those portions of the indictment relating to Kidnapping in the First Degree.

"(1) to inform the defendant of the nature of the crime with sufficient particularity to enable him to make his defense, (2) to identify the offense so as to enable the defendant to avail himself of his conviction or acquittal thereof if he should be prosecuted further for the same cause, and (3) to inform the court of the facts charged so that it may determine whether or not they are sufficient to support a conviction."

We conclude that Count I of the indictment was sufficient to fulfill those three functions.

■■■ ■■■ An indictment in the language of the statute generally is sufficient. *State v. Nussbaum,* 261 Or 87, 91, 491 P2d 1013 (1971); *State v. Tracy,* 246 Or 349, 354, 425 P2d 171 (1967). Count I tracks ORS 163.095(2)(e), the relevant statute. That statute provides in part:

"The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."

In this case, the indictment lists the various crimes of which defendant was charged. The indictment identified Count I as "AGGRAVATED MURDER"; Count I specifically referred to ORS 163.095(2)(e). It was not necessary for the indictment to allege all of the elements of the crime or crimes defendant intended to conceal in order to sufficiently state the crime of aggravated murder in Count I. We conclude that Count I is sufficiently definite and certain and that it adequately states the crime of aggravated murder. *State v. Cohen, supra.*

■■■ Furthermore, the proper time for defendant's objection to the indictment was before trial. A pre-trial demurrer would have given both the trial court and the state a timely opportunity to review the indictment and to make any necessary corrections before trial. *See* ORS 135.610 *et seq.* Defendant's objection at the end of his trial was untimely, and the trial court did not err in denying his motion for acquittal on that ground. *See State v. Holland,* 202 Or 656, 666-67, 277 P2d 386 (1954); *State v. Smith,* 182 Or 497, 507-08, 188 P2d 998 (1948).

■■■ Defendant next contends that the trial court erred in denying his motion for a judgment of acquittal on Count II. He argues that there was insufficient evidence for a reasonable trier of fact to find beyond a reasonable doubt that he intentionally "tortured" Straub.

Count II of the indictment reads in part:

"The said defendants * * * did unlawfully and intentionally cause the death of another human being, to-wit: Candice Straub, by strangling the said Candice Straub to death, in the course of intentional torturing of Candice Straub * * *."

Defendant's contention here, that the state failed to produce *any* evidence that Straub suffered intense physical pain, is ludicrous. Dr. Lewman, the medical examiner testified as to the pain that Straub suffered from her injuries. Further, defendant's contention misses the mark because the statute focuses on a defendant's intent to inflict intense pain, not on the quantum of pain actually suffered by a victim.

Defendant's own statements concerning his and Aikens' treatment of Straub and her reaction thereto, provided sufficient evidence for a reasonable jury to find beyond a reasonable doubt that defendant had the objective of inflicting intense pain on Straub, apart from his intent to murder her.[8]

No useful purpose will be served by detailing the explicit acts of cruelty defendant and Aikens perpetrated on Straub before they murdered her. Viewing the evidence in the light most favorable to the state, *State v. Harris,* 288 Or 703, 721, 609 P2d 798 (1980), we are satisfied that the evidence in the record is sufficient for the jury to have found that defendant intentionally "tortured" Straub (and that she suffered intense pain as a result of his acts). *See State v. Cornell/ Pinnell,* 304 Or 27, 31-32, 741 P2d 501 (1987); *see also State v. King,* 307 Or 332, 339, 768 P2d 391 (1989); *State v. Krummacher,* 269 Or 125, 137-38, 523 P2d 1009 (1974). We find no error.

■ Defendant contends that the trial court erred in denying his oral demurrer to Count III of the indictment on the ground that it failed to state a crime.

Count III of the indictment reads in part:

"The said defendants, acting together as part of the same act and transaction, on about June 21, 1987, in the County of Multnomah, State of Oregon, did unlawfully and intentionally

---

[8] In one of his statements to Goodale, prior to his admission that he had committed acts he had earlier attributed to Aikens, defendant himself characterized Aikens' conduct toward Straub as torture.

commit the crimes of Kidnapping in the First Degree, Rape in the First Degree, Sodomy in the First Degree, and Sexual Abuse in the First Degree and in the course of and in the furtherance of said crimes which the said defendants were committing, the said defendants personally and intentionally did cause the death of another human being, to-wit: Candice Straub, not a participant in the crime, by strangling the said Candice Straub to death, contrary to the Statutes in such cases made and provided and against the peace and dignity of the State of Oregon."

Defendant argues that there were no acts alleged in Count III which would constitute the crimes of rape in the first degree, sodomy in the first degree, and sex abuse in the first degree. He argues further that alleging those crimes only by name fails to specifically describe any conduct or circumstances which bring him within the statute defining those crimes and that Count III therefore is deficient because it lacks any statement indicating how or to whom the named criminal acts occurred.

Count III of the indictment was based on ORS 163.095(2)(d). That statute provides:

"Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b)."

ORS 163.115 provides in part:

"* * * criminal homicide constitutes murder:

"* * * * *

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants.

"* * * * *

"(H) Any felony sexual offense in the first degree defined in this chapter; * * *"

Count III tracks the language of ORS 163.115(1)(b)(H) and, on this record, that is sufficient.

Furthermore, defendant raised this objection for the

first time at the end of his trial. Thus, his demurrer was untimely, and the trial court did not err in overruling it.[9] *See State v. Holland, supra,* 202 Or at 666-67; *State v. Smith, supra,* 182 Or at 507. We find no error.

## Guilt Phase Instructions

Defendant contends that the trial court erred in instructing the jury on Count I. Defendant took no exception to the instruction at trial. He asks us nevertheless to consider his assignment of error under *former* ORAP 7.19(5) [the substance of which is now found in ORAP 5.45(2)] as an error of law apparent on the face of the record. We decline to do so. Upon examination of the entire record, we cannot say that the alleged error is manifest and that the ends of justice will not otherwise be satisfied unless we consider the assignment. *State v. Hitz,* 307 Or 183, 766 P2d 373 (1988); *State v. Hickman,* 273 Or 358, 360, 540 P2d 1406 (1975); *State v. Braley,* 224 Or 1, 9, 355 P2d 467 (1960).

Defendant contends that the trial court erred in failing to include the following statement in instructing the jury as to the definition of "torture" as the term is used in ORS 163.095(1)(e):

"However, not every infliction of intense physical pain, even though an intentional act known by the actor to be intensely painful, qualifies as torture."

The trial court instructed the jury:

"And the term 'torture' as used here in the statute in the charge is the intentional infliction of intense, physical pain upon an unwilling victim. The state must prove that the defendant had the objective of inflicting pain apart from any intent to cause the death of the victim."

In *State v. Cornell/Pinnell, supra,* 304 Or at 31-32, we concluded that the elements of intentional torture required a finding that a perpetrator "separately intended to inflict intense physical pain on an unwilling victim" apart from the murder itself. Defendant's requested instruction added nothing to the instructions given by the trial court. Accordingly,

---

[9] Defendant does not identify any prejudice from these alleged deficiencies in the indictment. He knew the state's three theories of aggravated murder, the identity of his victim, and the date, time and place of the murder. There were no surprises here, and defendant claims none.

the trial court did not err in refusing to give that instruction. *State v. Francis,* 284 Or 621, 626, 588 P2d 611 (1978) (requested instruction is properly refused unless it ought to have been given in the very terms in which it was proposed); *State v. Cody,* 116 Or 509, 520-21, 241 P 983 (1925) (court is not required to give requested instructions in the language asked even though law is correctly stated therein).

### Mistrial

Defendant contends that the trial court erred in failing *sua sponte* "to strike from the record the prosecutor's comment on defendant's failure to testify and to remain silent" and in failing *sua sponte* to give a curative instruction or declare a mistrial.

During his closing arguments, the prosecutor argued that defendant had repeatedly changed his story, establishing that defendant's earlier statements to Goodale had been untruthful and, thus, that it was unlikely that defendant's later statements to Goodale were the complete truth. The prosecutor concluded:

> "Your Honor, ladies and gentlemen, I just have one last thought that I want to leave you with and that is: what hasn't he told you about in this case? What is there in this case that you think that is yet unexplained that he doesn't feel he has had to talk about, that he has yet to admit? Please do not assume for a moment you still know all of it. Thank you."

Defense counsel did not object to that statement. Instead, he responded by arguing essentially that defendant's final statements to Goodale had been truthful and complete.

Defendant now argues for the first time that the trial court erred in failing to strike *sua sponte* the quoted argument on the ground that the prosecutor had improperly commented on defendant's failure to testify. He relies on *State v. White,* 303 Or 333, 341-42, 736 P2d 552 (1987) (prosecutor's remarks about defendant's failure to testify required mistrial). Defendant made no timely objection on this ground, nor did he ask for a mistrial, or for a curative instruction, or that the prosecutor's statement be stricken. Thus, he preserved no error. Defendant asks this court to consider this assignment of error as an error apparent on the face of the record. ORAP 5.45(2).

We decline to do so. *State v. Evans,* 290 Or 707, 713-15, 625 P2d 1300 (1981).

## Demurrer

Defendant contends that the trial court erred in overruling his demurrer to the indictment. His arguments raise thirteen separate state and federal constitutional challenges to Oregon's death penalty constitutional and statutory scheme. Several of the challenges previously have been rejected by this court and require no extended discussion.[10] We proceed to consider issues of first impression or issues unique to the indictment in this case.

### a. Validity of Ballot Measures 6 and 7

Defendant argues that 1984 Ballot Measures 6 and 7, which enacted the Oregon death penalty scheme for aggravated murder, are invalid because Measure 6 included no financial estimate and because Measure 7's financial estimate did not satisfy the requirements of *former* ORS 250.125. That statute provided:

> "When a state measure involves expenditure of public money by the state, reduction of state revenues or raising of funds by the state by imposing any tax or incurring any indebtedness, the Secretary of State, with the assistance of the State Treasurer, the Director of the Executive Department and the Department of Revenue, shall estimate the amount of expenditure, reduction in state revenues, tax revenue or indebtedness and interest which will be required to meet the provision of the measure if it is enacted. The estimate shall state the recurring annual amount involved or, if the measure does not involve a recurring annual amount, the total amount. The estimate shall be certified by at least two of the officials named in the section, and not later than the 90th day before the election at which the measure is to be voted upon, it shall be filed with the data upon which it is based, with the Secretary of State. *The estimate shall be printed in the voters' pamphlet and on the ballot unless the measure involves only administrative expenses not exceeding $50,000 per year.*" (Emphasis supplied.)

---

[10] *See State v. Wagner,* 309 Or 5, 786 P2d 93 (1990); *State v. Farrar,* 309 Or 132, 786 P2d 161 (1990); *State v. Moen,* 309 Or 45, 786 P2d 111 (1990); *State v. Pratt,* 309 Or 205, 785 P2d 350 (1990); *State v. Wagner,* 305 Or 115, 752 P2d 1136 (1988).

 *Former* ORS 250.125 provides no support for defendant's contention that an incomplete, inaccurate, or omitted financial estimate provides grounds for invalidating an initiative measure that subsequently has been enacted by the people of Oregon. The remedy, if any, for violation of ORS 250.125 is confined to injunctive relief that must be obtained prior to an election at which a measure is to be voted upon. Such relief would not be available *after* the electorate has approved a measure.

### b. Republican Form of Government

 Defendant argues that the initiative procedure, under which the people of Oregon bypass both the legislature and the governor to enact laws, somehow violates Article IV, section 4, of the United States Constitution, which provides:

"The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."

The United States Supreme Court has provided no practical guidance as to what constitutes a "republican form of government," because that Court has held that, within the federal government, the enforcement of the guarantee is assigned not to the federal courts but to the political branches. *See Pacific States Teleph. & Teleg. Co. v. Oregon,* 223 US 118, 32 S Ct 224, 56 L Ed 377 (1912) (challenge to a license tax enacted by an initiative measure). Thus, claims arising under Article IV, section 4, do not present justiciable controversies in federal courts.

That does not mean that the states may not adjudicate the compatibility of state law with the guarantee clause. This court addressed that issue with regard to Oregon's initiative system in *Kadderly v. Portland,* 44 Or 118, 144-45, 74 P 710, 75 P 222 (1903) (initiative and referendum does not abolish or destroy the republican form of government, or substitute another in its place).[11] *See Kiernan v. Portland,* 57 Or 454, 469-80, 111 P 379, 112 P 402 (1910); *Oregon v. Pacific States Tel. & Tel. Co.,* 53 Or 162, 166, 99 P 427 (1909).

---

[11] The Initiative and Referendum Amendment was added to the Oregon Constitution in 1902. Article IV, section 1.

■ However, a challenge to a particular initiative measure under the Guarantee Clause obviously involves extremely important as well as difficult questions. It is not an examination to be undertaken lightly, especially when Oregon's system of initiated legislation as such has long been sustained. *See Kiernan v. Portland, supra,* 57 Or at 469-80; *Oregon v. Pacific States Tel. & Tel. Co., supra,* 53 Or at 166; *Kadderly v. Portland, supra,* 44 Or at 144-45. It would require extensive briefing of the origins, the historic concerns and the drafters' political theories underlying the Guarantee Clause and how they might bear on the particular measure at issue. Such a thorough and focused analysis has not been presented in the present case. Nothing on the face of the death penalty statute leads us to venture into these uncharted waters on our own merely because the question is raised. We are unpersuaded by any of the arguments defendant makes in this case that the death penalty initiative violates Oregon's obligation under the state constitution or the federal Guarantee Clause to maintain a republican form of government.

### c. Former Jeopardy

■ Defendant argues that the ORS 163.150 provision for a guilt phase and penalty phase in aggravated murder/death penalty prosecutions subjects defendants to former jeopardy for purposes of Article I, section 12, of the Oregon Constitution and the Fifth Amendment of the United States Constitution. He argues that the statutory requirement that a jury must first find that a defendant *intentionally* murdered a victim and then must decide if that defendant. *deliberately* murdered that victim requires the jury to determine the *same* issue twice. We disagree. Those determinations do not involve the same issues. *State v. Wagner, supra,* 305 Or at 146-48.

The questions that a jury must answer in the penalty phase of a capital case are *not* elements of aggravated murder. Rather, they present considerations that a jury must weigh in determining whether a defendant convicted of aggravated murder should be executed or not. The penalty phase does not redetermine guilt; it determines only the appropriate sentence. A penalty phase hearing is merely a continuation of the same trial and not a separate or collateral proceeding threatening a new or different sanction. Consequently, the process does not violate Article I, section 12's, former jeopardy clause. Nor do bifurcated proceedings constitute former jeopardy for

purposes of the Fifth Amendment. *See Swisher v. Brady,* 438 US 204, 98 S Ct 2699, 57 L Ed 2d 705 (1978).

### d. Right to Confrontation

Defendant argues that because OEC 101(4)(d) exempts sentencing proceedings from all OEC rules except the Article V privilege rules, ORS 163.150(2) denied him a fair and reliable sentencing in violation of Article I, section 11, of the Oregon Constitution[12] and the Sixth (confrontation), Eighth (cruel and unusual punishment) and Fourteenth (due process) Amendments of the United States Constitution.

■ OEC 101(4)(d) does not violate defendant's confrontation rights.[13] The fact that specific rules of evidence that implement constitutional guarantees do not apply in sentencing proceedings did not deprive defendant of the constitutional rights themselves. ORS 163.150(1)(a) expressly provides that no evidence shall be received in violation of the Oregon or federal constitution, both of which guarantee the right to confrontation. Defendant does not contend that any evidence submitted by the state violated his confrontation rights.

---

[12] Article I, section 11, provides:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor; provided, however, that any accused person, in other than capital cases, and with the consent of the trial judge, may elect to waive trial by jury and consent to be tried by the judge of the court alone, such election to be in writing; provided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise; provided further, that the existing laws and constitutional provisions relative to criminal prosecutions shall be continued and remain in effect as to all prosecutions for crimes committed before the taking effect of this amendment."

[13] The Oregon Evidence Code (OEC) generally does not apply in sentencing proceedings. OEC 101(4)(d). However, the state agreed to be bound by the OEC in this case. We express no opinion as to the OEC's applicability generally to capital sentencing proceedings.

### e. Inadequate Post-Conviction Remedy

■ Defendant argues that the ORS 163.150(1)(g) [*formerly* 163.150(1)(f)] provision for direct and automatic review to the Supreme Court denies him post-conviction relief. We disagree. No provision in the death penalty statutory scheme precludes defendant from exercising his rights under the post-conviction relief statutes. ORS 138.510 *et seq.* Defendant may petition for post-conviction relief on any grounds stated in the post-conviction relief statutes after he exhausts his direct appeal rights. ORS 138.510(1).

We now briefly address defendant's assignments of error which are similar or identical to those we have already considered and rejected in our earlier cases.

### f. Unnecessary Rigor

Defendant argues that the death penalty statutory scheme violates Article I, section 13, of the Oregon Constitution, which provides:

> "No person arrested, or confined in jail, shall be treated with unnecessary rigor."

We rejected an identical argument in *State v. Moen,* 309 Or at 96-97.

### g. Selective Application

Defendant argues that ORS 163.095(2)(e) is unconstitutional because prosecutors might make "arbitrary, haphazard and *ad hoc* decisions concerning whether to charge a person with aggravated murder by concealment or 'regular' murder based upon the same conduct." He asserts that such prosecutorial discretion violates Article I, section 20, of the Oregon Constitution (privileges and immunities clause) and the equal protection clause of the Fourteenth Amendment. We considered and rejected this argument in *State v. Farrar, supra,* 309 Or at 134-39. *See United States v. Batchelder,* 442 US 114, 123-24, 99 S Ct 2198, 60 L Ed 2d 755 (1979); *cf., State v. Clark,* 291 Or 231, 243, 630 P2d 810, *cert den* 454 US 1084 (1981).

### h. Article I, Sections 15 and 16

Defendant argues that Article I, section 40, of the Oregon Constitution violates the Equal Protection Clause of

the Fourteenth Amendment in exempting the death penalty from challenges under Article I, sections 15 and 16.[14] We rejected that argument in *State v. Wagner, supra,* 305 Or at 138-42. *See State v. Farrar, supra,* 309 Or at 186-88.

### i. Proportionality

Defendant argues that although Article I, section 40, excludes the death penalty itself from the operation of Article I, section 16; section 40 does not exempt death penalty *statutes* from the operation of section 16. This court considered and rejected much of defendant's argument in *State v. Wagner, supra,* 305 Or at 138-42.

The United States Supreme Court has expressly approved imposition of the death penalty for intentional murders committed during the course of a dangerous felony. *Tison v. Arizona,* 481 US 137, 107 S Ct 1676, 95 L Ed 2d 127 (1987). We find no merit in defendant's claim that comparative sentence review may be required by the federal constitution because the United States Supreme Court has expressly held that the federal constitution does not require comparative sentence review of state death penalties. *See Pulley v. Harris,* 465 US 37, 104 S Ct 871, 79 L Ed 2d 29 (1984); *State v. Wagner, supra,* 305 Or at 169. Nor do we find any merit in defendant's argument that the death penalty is disproportionate to his crimes.

### j. Cruel and Unusual Punishment

Defendant argues that ORS 163.150 violates Article I, section 16, of the Oregon Constitution (cruel and unusual punishment) and the Eighth Amendment prohibition against cruel and unusual punishment by failing to adequately narrow the class of murderers who can be subjected to the death penalty. We disagree. *See Gregg v. Georgia,* 428 US 153, 168-88, 96 S Ct 2909, 49 L Ed 2d 859 (1976); *State v. Wagner, supra,* 305 Or at 142-45; *State v. Moen, supra,* 309 Or at 97-98.

---

[14] Article I, section 15, provides:

"Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice."

Article I, section 16, provides in part:

"Cruel and unusual punishments shall be not inflicted, but all penalties shall be proportioned to the offense."

### k. Right to an Impartial Jury

■ Defendant argues that the exclusion of prospective jurors whose opposition to the death penalty might prevent them from following the court's instructions denied him an impartial jury in the guilt and penalty phases of his trial in violation of Article I, section 11, of the Oregon Constitution. We disagree. *See State v. Wagner, supra,* 305 Or at 175-76; *State v. Leland, supra,* 190 Or at 623-26; ORCP 57D(1)(g).

### l. Lack of Meaningful Appellate Review

Defendant argues that the Oregon statutory scheme providing for automatic direct appeal to this court denies him the "right" to an intermediate appeal to the Court of Appeals available to non-capital criminals. In *State v. Wagner, supra,* 305 Or at 167-71 we held that the Oregon scheme provides for adequate appellate review under the Eighth Amendment and Article I, section 40, of the Oregon Constitution. *See State v. Quinn,* 289 Or 727, 618 P2d 412 (1980) (direct automatic Supreme Court review is sole appellate review in capital cases).

Defendant also argues that persons sentenced to death are entitled to a broader scope of review than criminal defendants generally. We understand his argument to be that he is entitled to *de novo* review of the jury's findings. We rejected this identical argument in *State v. Wagner, supra,* 305 Or at 169, 178. The scope of appellate review in death penalty cases is the same as in all other criminal cases.

### m. Vagueness in Sentencing Statutes

Defendant contends that the Oregon death penalty scheme is unconstitutionally vague because, he argues, the word "deliberately" as used in ORS 163.150(2)(b)(A) is vague. We rejected this argument in *State v. Wagner, supra,* 305 Or at 146-48. Defendant argues that ORS 163.150(1)(b)(B) is unconstitutionally vague because it requires a jury to perform a task, prediction of a defendant's future dangerousness, which some psychologists state cannot be done reliably. We rejected this argument in *State v. Wagner, supra,* 305 Or at 150-55. *See State v. Farrar, supra.*

■ Defendant argues that ORS 163.150(1) is vague because the statute does not expressly state how a jury is to

return a negative answer. The statute clearly requires unanimous "yes" answers to all questions; thus a "no" answer by a single juror on any question will defeat the death penalty. Moreover, without objection by defendant, the trial court instructed the jury that if all 12 jurors could not agree on any question, the answer to that question must be "no."

In sum, the Oregon death penalty scheme is not unconstitutionally "vague" under either the Oregon or the United States Constitutions. *State v. Wagner, supra; State v. Farrar, supra.*

## B. Penalty Phase

### Mitigating Evidence

Defendant contends that the trial court erred in refusing to give his requested instruction on mitigating evidence. He primarily relies upon *Penry v. Lynaugh,* 492 US ___, 109 S Ct 2934, 106 L Ed 2d 256 (1989).

Defendant requested the following instruction on mitigating evidence:

"DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 16

"You may consider any type of mitigating circumstances, including but not limited to, mitigating circumstances about the defendant or the circumstances of the case that in any way diminish defendant's culpability in your mind. A mitigating factor need not be reacted to the issues set forth in the (*two*) questions presented to you. You may decide to answer any one of the two questions "no" even if the other evidence would justify a "yes" answer.

"Mitigating circumstances are those circumstances such as do not constitute a justification or excuse of the offense in question, but which in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability of defendant's conduct. A mitigating circumstance need not be proven beyond a reasonable doubt.

"Mitigating circumstances include, but are not limited to:

"1. The defendant's age.

"2. The extent and severity of the defendant's prior criminal conduct.

"3. The extent of the mental and emotional pressure under

which the defendant was acting at the time of this incident.

"You may consider in mitigation, any feelings of mercy, sympathy or compassion that arise in you. You may not be swayed by any prejudice or bias against the defendant or by public opinion."[15]

For the reasons explained in *State v. Wagner, supra,* 309 Or at 7-20, we remand this case to the circuit court for a new penalty phase. *See State v. Farrar, supra,* 309 Or at 176-78; *State v. Miranda, supra,* 309 Or at 130-31; *State v. Moen, supra,* 309 Or at 93-95.

Defendant raises three other assignments of error in connection with the penalty phase of his trial. We proceed to discuss those issues because they may arise on remand.

### Prior Crimes Evidence

Defendant contends that the trial court erred in refusing to exclude from the penalty phase testimony by Annie Edmo and Detective Goodale concerning defendant's uncorroborated admissions of prior crimes. Edmo testified that defendant had told her that "he had killed before and he was a three time loser." No other evidence was offered by the state to prove defendant had "killed" before. Goodale testified that defendant had admitted a number of prior crimes. However, the state introduced corroborating evidence (in the form

---

[15] The trial court instructed the jury:

"The second question asked by the law is: Is there a probability, meaning is it more likely than not, that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

"Defining some of these terms, 'probability' means as we employ it here, it's to be given its ordinary meaning or use in everyday affairs and in dealings, and in such everyday affairs the term 'probability' means that is more likely than not that a certain event will occur in the future.

"In determining this issue you are to consider any mitigating circumstances received in evidence including but not limited to the defendant's age, the extent and severity of the defendant's prior criminal conduct, and the extent of the mental and emotional pressure under which the defendant was acting at the time the killing was committed.

"If you decide beyond a reasonable doubt — oh, I should define 'mitigation' as meaning to make less severe or less harsh. So it's a downgrading.

"In deciding whether the State has proven the affirmative of the two questions beyond a reasonable doubt, you must answer each yes. Conversely, if you decide that the State has failed to prove the affirmative of any or more of the questions beyond a reasonable doubt, you must then answer each question no."

of judgment orders, charging instruments or testimony) on only some of the admitted crimes.

■■■ ■■■ Defendant argues that the rationale of ORS 136.425(1) applies to prior crimes evidence introduced in sentencing proceedings. ORS 136.425(1) provides:

> "(1) A confession or an admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats; *nor is a confession only sufficient to warrant the conviction of the defendant without some other proof that the crime has been committed.*" (Emphasis added.)

ORS 136.425(1) addresses sufficiency of evidence to sustain a conviction and does not apply here. A penalty phase jury is not required to "convict" a defendant of prior crimes. Rather, the jury must decide by answering the questions required by ORS 163.150 whether a particular defendant should or should not receive a death sentence. Because defendant's confessions of prior crimes were highly relevant to the jury's consideration of those questions, we conclude that those confessions, even if uncorroborated, were properly admitted during the penalty phase of defendant's trial. *State v. Wagner, supra,* 305 Or at 156-57, 178; *State v. Pratt, supra,* 309 Or at 210 n 3; *State v. Moen, supra,* 309 Or at 72-73.

■■■ Defendant also argues that such evidence violates the OEC 404 propensity rule. OEC 404(2) states the general propensity rule:

> "Evidence of a person's character is not admissible for the purpose of providing that the person *acted* in conformity therewith on a particular occasion * * *." (Emphasis added.)

This general propensity rule is restated in OEC 404(3):

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person *acted* in conformity therewith. * * *" (Emphasis added.)

Thus, the Oregon Evidence Code proscribes character evidence only when offered to prove *past* conduct, not when offered to predict *future* behavior.

■■■ When character is "in issue," evidence of pertinent specific instances of conduct (*e.g.,* prior crimes) is admissible

to prove such character or character trait. OEC 405(2)(a). Under OEC 404(1), evidence of a person's character or trait of character is "in issue" when it is an essential element of a charge, claim or defense. When offered to predict future behavior, the evidence is offered to prove a character quality which ORS 163.150(1)(b)(B) makes independently relevant to penalty assessment: *i.e.,* future dangerousness. To the degree that future dangerousness depends on character, the defendant's character has been placed "in issue."

Defendant also objected on the ground that such evidence violates OEC 403.[16] On this record, we disagree. OEC 403 provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

If OEC 403 were held to be available to block the proffered evidence on the grounds argued by defendant in this case, that would be tantamount to blocking proof of character when the substantive law has declared it (future dangerousness) to be a provable fact.[17]

### Penalty Phase Instructions

Defendant contends that the trial court erred in refusing to give the following instruction:

> "To the extent that you find the Defendant has made statements that you decide constitute a confession to a crime, you may not consider such evidence, without proof, other than the statements themselves, that such a crime has been committed."

As noted *supra,* neither ORS 136.425(1) nor any other evidentiary rule requires corroboration of admissions to prior crimes in sentencing proceedings, thus defendant's proposed instruction is an incorrect statement of the law, which the court

---

[16] In fact, the trial court did perform an OEC 403 balancing and determined that the prejudicial effect of defendant's admissions to prior crimes did not substantially outweigh their probative value.

[17] Under OEC 405(1), when character is "in issue," proof also may be "by testimony as to reputation or by testimony in the form of an opinion."

properly declined to give. *State v. Francis, supra,* 284 Or at 626.

Defendant also contends that the trial court erred in failing to give the following instruction:

> "The law presumes that the accused will not commit criminal acts of violence in the future. That presumption follows the Defendant unless and until the probability of the commission of such violent criminal acts is proven beyond a reasonable doubt. The burden is upon the State to prove probability of the Defendant committing violent criminal acts to constitute a continuing threat to society beyond a reasonable doubt."

Defendant argues that this instruction follows from the legal presumption that a person is innocent until proven guilty. He relies on ORS 136.415, which provides:

> "A defendant in a criminal action is presumed to be innocent until the contrary is proved. In the case of a reasonable doubt whether the guilt of the defendant is satisfactorily shown, the defendant is entitled to be acquitted."

He also relies on ORS 10.095(6), which requires that a trial court instruct the jury:

> "That in criminal cases a person is innocent of a crime or wrong until the prosecution proves otherwise, and guilt shall be established beyond reasonable doubt[.]"

The trial court instructed the jury that the state must prove beyond a reasonable doubt that there was a probability defendant would commit criminal acts of violence that would constitute a continuing threat to society, thus informing the jury that the state had the burden of proof and of the standard of proof required. No more was required. *State v. Wagner, supra,* 305 Or at 153, 177; *State v. Farrar, supra,* 309 Or at 178; *State v. Francis, supra,* 284 Or at 626. Defendant's requested instruction added nothing and would have served only to confuse the jury. A presumption that a convicted murderer will not commit criminal acts of violence in the future has no basis in law or common sense. *Cf. Greer v. United States,* 245 US 559, 560-61, 38 S Ct 209, 62 L Ed 469 (1918) (trial court correctly refused to instruct jury that defendant was presumed to be of good character).

### III. Conclusion

We have considered all of defendant's assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion has been considered and is either without merit or moot. We find no error as to the guilt phase of his trial. We find error as to the penalty phase of his trial. We reverse as to the penalty phase only.

### IV. Decision

The judgment is affirmed as to the guilt phase and is reversed as to the penalty phase, and the case is remanded to the circuit court for resentencing consistent with this opinion. *See State v. Wagner,* 309 Or 5; *see also Penry v. Lynaugh, supra.*

**GILLETTE, J.,** dissenting.

Because I believe that, under the legal standard recognized by the majority, juror Michael Boley should have been excused for cause, I respectfully dissent.

The majority has, with commendable candor, set out the pertinent portions of the Boley *voir dire.* (309 Or at 577-93) During that *voir dire,* after Boley had established that he was a strong believer in the death penalty, defense counsel asked the juror if he "could be fair in a case like this given your personal feelings, your strong personal feelings[?]" Boley answered, "I think I could, but, you know, some points it might be a little difficult, yeah."

Immediately following this expression of doubt, Boley brought up *sua sponte* the murder of an acquaintance. He acknowledged still carrying feelings of anger about that crime. It is clear that these two subjects — Boley's uncertainty about his ability to be fair and his memories of the murder of the relative — are connected in Boley's mind.[1] Defense counsel sensibly asked, "Is there any possibility that your feelings

---

[1] It is manifest that this juror had serious doubts about his own ability to be fair. A short time later, Boley made this clear when, in response to a question by defense counsel concerning the gruesome facts surrounding the death in this case, he stated: "It might be tough [to be fair to defendant if the facts were as gruesome as described by counsel], yeah. *That's kind of why I brought it up to you.*" (Emphasis added.)

of anger about that situation would come out in this case?"
Boley answered,

> "I would follow the law the best I could, but, you know,
> there's a possibility in revealing evidence and stuff like that
> that I saw pictures or whatever have you, you know, it's just
> that click my brain that, yeah I might. I'm not sure but, yeah,
> there's a possibility."

Counsel made an effort to explore the "possibility":

> "[DEFENSE COUNSEL:] * * * How strong is that pos-
> sibility?
>
> "JUROR BOLEY: * * * On a scale from one to ten, you
> know, a three, four."

Further questioning by defense counsel and
especially by the prosecutor produced assurances from the
juror that he would follow the law — given the leading form in
which virtually all these questions were put, with the expected
answer so self-evident, any other responses would have been
astounding. Yet, in spite of all the rehabilitation, the last
question and answer revealed the degree to which this pro-
spective juror had his doubts about his own competency to
serve:

> "[THE PROSECUTOR:] And can you set aside your
> personal feelings in doing that, in following the law?
>
> "[JUROR BOLEY:] Yes, I would. I would try to do the
> best I could."

What we have here is a prospective juror who has
very strong feelings about the death penalty being appropriate
for most murders, who on his own volunteers the existence of
the murder of someone he knew under circumstances that still
anger him, and who expresses the likelihood that he will be
able to set aside his feelings and follow the law as being as low
as six in ten. Yet, the trial court declined to excuse the pro-
spective juror for cause and a majority of this court now
affirms that decision on the ground that such decisions are
committed to the trial court's "sound discretion," and will not
be reversed except for "manifest abuse."

Disqualification of jurors is governed, so far as is

pertinent to this case, by ORCP 57D(1)(g).[2] That rule provides:

> "Challenges for cause may be taken on any one or more of the following grounds:
>
> "* * * * *
>
> "Actual bias, which is the existence of a state of mind on the part of the juror, in reference to the action, or to either party, which satisfies the court, in the exercise of a sound discretion, that the juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging. A challenge for actual bias may be taken for the cause mentioned in this paragraph, but on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon the merits of the cause from what the juror may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially."

Obviously, the application of this rule leaves much in the hands of the trial judge. The judge sees and hears the testimony of the potential juror. He is in the best position to determine whether the existence of a bias, once identified, so infects the attitude of a potential juror that in fairness to a party the juror should not sit on that case. But the primacy of the trial judge's role does not mean that we have no role to play.

The trial court's only explanation of its rulings denying defense motions to excuse this juror came in the following statements:

> "THE COURT: Well, the standard, of course would be probability, not possibility, because anything is possible.
>
> "* * * * *
>
> "THE COURT: [I] still think [the gravamen of the prospective juror's answers is] in the possibility area and is not sufficient for a basis of challenge."

I understand from these statements that the trial judge felt that it had to be established as being *more probable than not*

---

[2] ORCP 57D(1)(g) is made applicable to criminal trials by ORS 136.210(1). *State v. Nefstad,* 309 Or 523, 531, 789 P2d 1326.

that Boley's views would interfere with performing his duties as a juror. The majority rejects this standard relied upon by the trial judge. It says:

> "If the question was whether juror Boley would give defendant a fair trial, rather than whether reaction to specific evidence might affect his verdict, a possibility of unfairness of 3 or 4 on a scale of 10 casts sufficient doubt on Boley's ability to be fair as to warrant a right to defendant to have Boley excused for cause. The *voir dire,* however, did not stop here.
>
> "Boley thereafter specifically answered that he would follow the court's instructions and be fair to both the defendant and the state and he retreated from his earlier position of doubt."

309 Or at 586.

The difficulty with this analysis is that nowhere later in Boley's *voir dire* did the *trial judge* acknowledge the correct standard or purport to apply it. We therefore cannot know on this record whether the court recognized the correct standard and applied it, *i.e.,* we cannot know if his exercise of discretion was of "sound discretion" as required by ORCP 57D(1)(g). The only statements that we have from the judge affirmatively indicate that the judge was not correctly evaluating the significance of the evidence he was hearing. Thus, although it is true that there were later statements from the prospective juror that might have indicated that the juror really was rehabilitated, *i.e.,* that he really had shaken off his doubts and determined that he could do his job as a juror, *we cannot know if the trial judge relied on those statements, or instead thought them irrelevant because the prospective juror had not yet admitted that he was fifty-one percent sure he couldn't fairly hear the case.*[3]

This defendant, however disgusting his crime, did not have the fair and impartial jury to which he was entitled by statute and under the Oregon and federal constitutions.

I respectfully dissent.

Fadeley, J., joins in this dissenting opinion.

---

[3] What is clear is that the trial judge believed Boley — there would be no need to describe what the trial judge understood to be the test for disqualification, unless the judge believed Boley but felt Boley's testimony did not meet that test.

**FADELEY, J.,** dissenting.

I dissent for the reasons stated in the dissenting opinions in *State v. Moen,* 309 Or 45, 786 P2d 111 (1990) and *State v. Wagner (II),* 309 Or 5, 786 P2d 93 (1990). I believe the court should assess and fix final punishment now under the statute rather than sending this case back to the trial court for a further penalty phase trial which will lead to further delay and may lead to further appeals costly to the public.